# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Jackson v. Board of Election Commissioners*, 2012 IL 111928

---

| | |
|---|---|
| Caption in Supreme Court: | EILEEN JACKSON, Appellee, v. THE BOARD OF ELECTION COMMISSIONERS OF THE CITY OF CHICAGO *et al.* (Carmelita Earls, Appellant). |
| Docket No. | 111928 |
| Filed | September 7, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Statutory ineligibility for municipal office based on debts owed to the municipality cannot arise from arrearages in property taxes, which are due and payable only to the county collector, even though funds so received are distributed to taxing districts, such as municipalities; where the election was over, issue addressed in spite of claimed mootness, but question of a new election deemed forfeited. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Maureen Ward Kirby, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Randy Crumpton, of Chicago, for appellant. |
| | |
| | James P. Nally, P.C., of Chicago, for appellee. |
| | |
| Justices | JUSTICE KARMEIER delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Thomas, Garman, and Theis concurred in the judgment and opinion. |
| | Justice Freeman concurred in part and dissented in part, with opinion, joined by Justice Burke. |

## OPINION

¶ 1    Section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) provides that a person "is not eligible for an elective municipal office if that person is in arrears in the payment of a tax or other indebtedness due to the municipality." The issue presented by this case is whether section 3.1-10-5(b) should have disqualified a candidate named Carmelita Earls from seeking election to the Chicago city council from the 28th Ward in the 2011 municipal election where homestead exemptions on property owned by Earls and her husband were challenged and the couple subsequently elected to waive the exemptions on all but one of the parcels and to pay the Cook County treasurer the additional property tax that would have been due on the parcels had the exemptions not been claimed.

¶ 2    The board of election commissioners of the City of Chicago (the Election Board) ruled that Earls was not disqualified and denied an objection to her nomination papers filed by Eileen Jackson. The circuit court of Cook County upheld the Election Board's decision, but the appellate court reversed, set aside the Election Board's decision, and ordered that if Earls' name could not be removed from the ballot, any votes cast for her would not be counted. 407 Ill. App. 3d 837. We allowed Earls' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 3    For the reasons that follow, we hold that property tax payable to the Cook County treasurer does not constitute "a tax or other indebtedness due a municipality" within the meaning of section 3.1-10-5(b) and that the additional property tax Earls and her husband paid after the homestead exemptions were challenged did not render Earls ineligible to hold municipal office in Chicago. The Election Board was therefore correct when it rejected Jackson's objection to Earls' nomination papers. The Election Board's decision was properly upheld by the circuit court, and the appellate court should not have overturned the Board's decision on review. The judgment of the appellate court is therefore reversed.

¶ 4                                        BACKGROUND

¶ 5        Carmelita Earls and her husband, Aubrey, own, as joint tenants, a home located at 37 N. Long Avenue in the City of Chicago. Aubry applied to the Cook County assessor for a homeowner's exemption for that property for the 2008 tax year. In the application, Aubry specifically averred that he and Earls occupied that property as their "principal residence."

¶ 6        Earls and Aubry also own two additional properties in the City of Chicago, 552 and 555 N. Lawler Avenue. Just as he had with the property at 37 N. Long Avenue, Aubry applied to the Cook County assessor for a homeowner's exemption for both of those properties for the 2008 tax year. These exemptions were not identical. Whereas the application for 555 N. Lawler Avenue sought the same general homestead exemption as the application for the exemption on 37 N. Long Avenue, the application for 552 N. Lawler Avenue requested a "long-time occupant" homestead exemption (see 35 ILCS 200/15-177 (West 2008)) and stated that Earls and Aubrey had owned and occupied the property during the period between January 1, 1998, and January 1, 2008, and met certain other qualifications related to their income.

¶ 7        The Cook County assessor allowed the homestead exemptions on all three properties, thereby reducing the amount of property tax Earls and her husband were required to pay on those properties. The exemptions were subsequently carried forward, reducing the couple's real estate tax bills for the 2009 tax year, which were payable in 2010.

¶ 8        In 2010, Earls decided to run for the office of alderman for the 28th Ward of the City of Chicago in the next general municipal election, which was scheduled to take place on February 22, 2011. Under section 3.1-10-5(b) of the Illinois Municipal Code, a person "is not eligible for an elective municipal office if that person is in arrears in the payment of a tax or other indebtedness due to the municipality." 65 ILCS 5/3.1-10-5(b) (West 2010). Because the position of alderman is an "elective municipal office" within the meaning of this statute, Earls wanted to insure that she was in compliance with the law. She therefore checked with the City to see if she owed it any money.

¶ 9        The City maintains a special office to field such inquiries. That office, officially known as the "Indebtedness Check Unit" of the City of Chicago department of revenue's accounts receivable division, responded to Earls' request in writing. By letter dated November, 17, 2010, it advised her as follows:

            "The Department of Revenue performed a thorough indebtedness investigation at the request of the individual referenced above[, Carmelita Earls,] on the date indicated for outstanding debt owed to the City of Chicago.

            Please accept this as confirmation that no outstanding debt was found across any of the debt types, Parking, Water, Administrative Hearings, Inspection Fees, Cost Recovery and Tax/Licensing."

¶ 10       Five days after this statement was issued, Earls filed nomination papers for her aldermanic bid with the Election Board. Eileen Jackson promptly filed a petition objecting to Earls' candidacy. See 10 ILCS 5/10-8 (West 2010). Jackson asserted numerous grounds in support of her petition. Chief among these were that Earls had failed to submit a sufficient number of valid signatures to entitle her to be placed on the ballot for alderman, that Earls'

nomination papers were not securely fastened as required by law, that Earls was not a resident of the ward in which she was seeking to run, and that Earls was not eligible for elective municipal office under section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) because she was in arrears in payment of taxes or other indebtedness to the City.

¶ 11    Although the Chicago department of revenue had declared that Earls owed no outstanding debt to the City for the various items identified in the statement of indebtedness, Jackson's petition asserted that Earls was nevertheless ineligible because she was in arrears on her property tax. Though records showed no overdue balance on Earls' property tax obligations, Jackson asserted that Earls and her husband had paid less than they should have by fraudulently obtaining homeowner exemptions to which they were not entitled.

¶ 12    Jackson's objection petition was first taken up by the Election Board on December 6, 2010. Following various procedural developments not relevant here, an evidentiary hearing on Jackson's petition was held before an Election Board hearing officer on December 22, 2010. At that hearing Jackson elected not to contest that Earls' nomination papers were, in fact, supported by a sufficient number of valid signatures. She withdrew any challenge to Earls' residency, and she produced no evidence that Earls' petitions had not been properly bound. The only matter in dispute was whether Earls was in arrears in payment of taxes or other indebtedness and therefore ineligible for municipal office under section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) at the time she filed her nomination papers.

¶ 13    In support of her tax/debt arrearage claim, Jackson relied on a letter dated December 6, 2010, from the Cook County assessor's office informing Earls of a problem with the homestead exemptions on the three properties she owned with her husband. The letter explained that homestead-exempted property must be the " 'principal dwelling place of members of the household on January 1 of the taxable year' [(see 35 ILCS 200/15-175, 15-177 (West 2008)) and that a] taxpayer is only entitled to one homeowner exemption on one residence." The letter went on to inform Earls and her husband that an investigation had disclosed that they had received homeowner exemptions for all three properties they owned in the City.

¶ 14    According to the letter, application of the homeowner's exemption to the 555 N. Lawler Avenue property had reduced the Earls' real estate tax liability for that parcel by $963.20 in 2008 and by $669.16 in 2009. For the property at 552 N. Lawler Avenue, the homestead exemption saved Earls and her husband $1,624.29 in 2008 and $1,220.60 in 2009. The assessor's letter notified Earls and her husband that they were required to provide proof of residency for one of the three properties if they wished to avail themselves of the homestead exemption and that with respect to the other two properties, they would be required to "refund" the amount of tax they had saved through the exemptions unless they could show that the properties had been rented, that the tenants were required to pay the property tax and that the tax had actually been paid by the tenants. The assessor's letter did not indicate how much the potential tax payment "refund" Earls might owe related to tax levies made by the City of Chicago or any other taxing bodies for the years in question. It merely gave lump sum amounts and indicated that "refund" checks should be made payable to the Cook County

-4-

treasurer's office.

¶ 15 Earls and her husband received the assessor's letter on December 13, 2010. Evidence adduced at the Election Board hearing showed that Earls' husband promptly executed documents waiving the homeowners exemption on the two properties located on Lawler Avenue and immediately made additional payments to the Cook County treasurer to make up for the reduction in taxes he and Earls had enjoyed as a result of application of the homestead exemption to those two properties. Earls testified that the payments exceeded $4,000, a figure consistent with the amounts set forth in the assessor's letter.

¶ 16 After hearing the evidence, the hearing officer made written findings of fact and conclusions of law. In the hearing officer's view, Jackson had failed to demonstrate that the additional property tax paid by Earls and her husband to the Cook County treasurer based on the Cook County assessor's challenge to the homeowner exemptions "are of the type contemplated under the Illinois Municipal Code that should bar [Earls] from being eligible to seek municipal office." He therefore recommended that the Election Board deny Jackson's objection and that Earls' name be printed on the ballot.

¶ 17 The Election Board adopted the hearing officer's recommended findings of fact and conclusions of law. In so doing, it noted that to the extent there was evidence of tax or other indebtedness, that obligation (the extra property tax) pertained to an amount Earls had to pay to Cook County, not the City of Chicago. It further observed that the hearing officer had been correct when he concluded that there was no support in the law for holding that "a debt purportedly owed to Cook County would bar a candidate from seeking office in the City of Chicago." In a written decision dated January 11, 2011, the Election Board therefore overruled Jackson's objection to Earls' candidacy, declared her nomination papers to be valid, and ordered that her name be printed on the ballot for election to the office of alderman for the 28th Ward in the municipal general election to be held February 22, 2011.

¶ 18 Jackson petitioned for judicial review (see 10 ILCS 5/10-10.1 (West 2010)), raising only the question of whether Earls was in arrears on a tax or other debt due to the City and therefore ineligible for municipal office because she and her husband had claimed homeowner exemptions to which they were not entitled and had therefore paid less in property tax than they should have. In an order entered January 27, 2011, the circuit court confirmed the decision of the Election Board to reject Jackson's objection petition and ordered that Earls' name was to appear on the ballot for the February 22 general election as a candidate for alderman for the City's 28th Ward.

¶ 19 Jackson filed her notice of appeal on February 7, 2011. Although that was just 15 days before the municipal election, the appellate court agreed to consider the appeal on an expedited basis and was able to file a written decision prior to the election. In its opinion, the appellate court reviewed the statutory scheme pertaining to taxes levied on real estate. It concluded that, "given the plain language of our statutory enactments, there is no question the amounts levied by the city of Chicago through property taxes are owing and payable to the city." 407 Ill. App. 3d at 846.

¶ 20 Taking the view that the homestead exemptions on two of the three properties owned by Earls and her husband were, in fact, unauthorized and that Earls owed back taxes as a result

-5-

of having paid less in real estate tax than she should have on those parcels (*id.* at 842), the appellate court reasoned that Earls "was in arrears on her taxes to the city at the time she filed her nominating papers" (*id.* at 848) and therefore ineligible to run for alderman under section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)). Accordingly, the appellate court reversed the judgment of the circuit court and set aside the Board's decision. In so doing, it ordered that Earls' name be excluded or removed from the ballot for the February 2011 municipal election. The appellate court's opinion further provided that if time constraints precluded the Board of Elections from physically removing Earls' name from the ballot, voters taking ballots in the 28th Ward were to be given a written notice that Earls had been found disqualified to run, that she was no longer a candidate, and that votes cast for her would not be counted. In addition, the appellate court directed that any votes cast for Earls on absentee ballots or early voting ballots not be counted. *Id.* at 848.

¶ 21    The appellate court's opinion was filed Friday, February 18, the last business day prior to the February 22 municipal election, and the court ordered that its mandate was to issue immediately. Although Earls could have requested the appellate court to recall its mandate and stay its judgment to permit her to seek review in our court (Ill. S. Ct. R. 368(c) (eff. July 1, 2006)), she did not do so. Instead she elected to proceed directly to our court with an emergency motion for a stay of the appellate court's judgment. She also asked us to grant expedited consideration of her petition for leave to appeal once it was filed. Both requests were placed on this court's regular First District motion call the next business day, February 22, which was the day of the election. (Monday, February 21, was a legal holiday.) The motion for stay was referred to the full court, making a concurrence of four members of this court necessary to dispose of it. Ill. Const. 1970, art. VI, § 3. That did not occur until the following day, after the election had concluded. At that time an order was entered denying Earls' request for a stay and for expedited consideration, but granting her leave to file a petition for leave to appeal to be considered "in due course."

¶ 22    The timing of the appellate court's judgment meant that the Election Board did not have sufficient time to remove Earls' name from the ballot or delete reference to her on its automated voting machines. In addition, there is no dispute that voters cast absentee and early voting ballots which included Earls' name. Because the appellate court's unstayed judgment directed that votes for Earls were not to be counted, and considering that voters were instructed that any votes for Earls would not be counted, we do not know how many votes Earls actually received, nor can we ascertain how many votes she might have received had the appellate court not sustained Jackson's objections. Election results disclose, however, that in the same election, a total of 8,386 votes were cast in the 28th Ward for the six mayoral candidates, the 28th Ward's combined vote total for the two candidates running for county clerk was 7,912, and 7,004 votes were received in the 28th Ward by the single unopposed candidate running for county treasurer. In the election for 28th Ward alderman, the two candidates who remained in the race after Earls was declared ineligible received a total of 6,780 votes. Of these, 5,742, or 84.69%, went to Jason Ervin, who was already serving in the post after having been appointed to fill a vacancy created when the previous 28th Ward alderman resigned. Challenger William Siegmund received just 1,038 votes. Ervin was declared the winner of the race and began a full four-year term as 28th Ward alderman in

May of 2011.[1]

¶ 23     Earls filed a timely petition for leave to appeal (Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010)) on March 11, 2011. Our court considered that petition in due course and allowed it at its May 2011 term. Following briefing, for which additional time was requested by both parties, the case was argued before our court in January of 2012 and is now before us for a decision.

¶ 24                                          ANALYSIS

¶ 25     In undertaking our review, we first consider Jackson's contention that the "clean hands" doctrine should preclude Earls from obtaining any relief from the courts. According to Jackson, Earls has "unclean hands" in that "it was the candidate's own fraudulent conduct in taking multiple homeowners exemptions that led to the termination of her candidacy, and she *** should not benefit from this wrongful conduct in this proceeding."

¶ 26     Under the "clean hands" doctrine, a party who has been guilty of misconduct, fraud, or bad faith in connection with the matter in dispute is prohibited from coming to court and asking for equitable relief. *O'Brien v. Cacciatore*, 227 Ill. App. 3d 836, 846 (1992). It is based on the principle that litigants should not be permitted to enlist the aid of a court of equity to further their fraudulent or unlawful purposes or take advantage of their own wrongdoing. *Cole v. Guy*, 183 Ill. App. 3d 768, 776 (1989); *Brown v. Ryan*, 338 Ill. App. 3d 864, 875 (2003). The doctrine is not favored (*Brinkley v. Brinkley*, 174 Ill. App. 3d 705, 714 (1988)), however, and it can have no application here. That is so for several reasons.

¶ 27     The first and most basic obstacle to Jackson's "clean hands" argument is that this is not a proceeding to obtain equitable relief. It is an appeal from a statutory challenge to a candidate's eligibility for elective office under this State's elections law. Jackson has not cited and we have not found any authority where the clean hands doctrine has been invoked to bar an appeal in an election case. Second, Earls, the party whose honesty has been questioned, was not the one who initiated judicial review of the Election Board's decision. The party who first sought the aid of the courts was Jackson, the objector. Earls is merely appealing the decision of the appellate court, which concluded that Jackson's objection should have been sustained. Jackson has not cited and we have not found any authority where the clean hands doctrine has been invoked to prevent a litigant from appealing a judgment in a case initiated by someone else. Third, though Jackson seeks to characterize Earls' conduct as "fraudulent," no finding of fraud or bad faith was ever made. Finally, fraud or bad faith in the procurement of property tax exemptions could only be relevant to Jackson's legal challenge to Earls' eligibility for municipal office if the resulting underpayment of property tax meant that Earls was in arrears in payment of tax or other indebtedness due to the municipality. As we shall explain later in this opinion, however, the additional property tax Earls and her husband paid after their exemptions were questioned was not money due to Chicago. It was money due the county. Indebtedness to the county, whether it involves fraud

_____

[1]A court may take judicial notice of an authorized election and its results. See Ill. R. Evid. 201(b) (eff. Jan. 1, 2011); *Bluthardt v. Breslin*, 74 Ill. 2d 246, 250 (1979); Michael H. Graham, Handbook of Illinois Evidence § 201.3, at 82-83 (10th ed. 2011).

and dishonesty or not, does not render a candidate ineligible for municipal office under the statutory provisions on which Jackson's objections are based.

¶ 28    Jackson also asserts that Earls' appeal should be dismissed as moot. A case on appeal becomes moot where the issues presented in the trial court no longer exist because events subsequent to the filing of the appeal render it impossible for the reviewing court to grant the complaining party effectual relief. *Goodman v. Ward*, 241 Ill. 2d 398, 404 (2011); *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 207-08 (2008). Jackson argues that effectual relief is no longer possible here because, as we have just described, the election proceeded as scheduled on February 22, 2011, and as the result of that election, someone else was selected for the office sought by Earls and has been serving in that post for more than a year.

¶ 29    Earls anticipated Jackson's mootness argument when she filed her petition for leave to appeal. Although Earls acknowledged that the election was already over, she noted in her petition that the City of Chicago was "still scheduled to have run-off elections for at least 14 various wards throughout the city on April 5, 2011," and suggested that our court could still hear and decide the case in time to permit her to participate in a runoff election in the 28th Ward on the same date. If that were not possible and the case could not be heard by April 5, 2011, Earls asked, in the alternative, that we nevertheless consider and resolve the underlying legal dispute under the public interest exception to the mootness doctrine.

¶ 30    After this court allowed Earls' petition for leave to appeal, she filed a brief which echoed this position. The brief stated that she would "welcome a special election between herself and the highest vote getter in the [February 22] municipal general election for the 28th ward" and prayed "that this court would order the [Election Board] to hold a special election for Alderman of the 28th Ward, ordering that her name be placed on the ballot."[2] If such relief were not possible, however, Earls asked that we nevertheless reach the merits under the public interest exception to the mootness doctrine.

¶ 31    Though the position Earls took in her brief paralleled the approach she advanced in her petition for leave to appeal, remarks made by Earls' appellate counsel at oral argument indicate that his client's position has actually changed. Earls' request for a special election is no longer contingent on the court's ability to rule prior to Chicago's April 5, 2011, runoff election. Rather, Earls asserts that a new election for 28th Ward alderman could and should be ordered even though the April 5 runoff elections have long since concluded.

¶ 32    Earls' request for a post-April 5 special election is not properly before us. That is so for two reasons. First, if Earls wanted a new election outside the normally scheduled April 5 runoffs, it was incumbent upon her to include such a request in the petition for leave to appeal. Because she failed to do so, we deem the issue to be forfeited. *Buenz v. Frontline*

---

[2]Such a runoff between Earls and the person who received the most votes in the February 22, 2011, election differs significantly from the type of election which the partial dissenter would now order. He argues for a completely new election involving both of the other candidates, not just the top vote getter. Although the partial dissent purports to act consistently with Earls' stated desires, he does not explain why he is now urging a result different from any she ever actually requested.

*Transportation Co.*, 227 Ill. 2d 302, 320 (2008). Second, while Earls has presented ample argument and authority on the underlying question of why the Election Board properly rejected Jackson's objections to her nomination papers, she has offered none at all on the separate and distinct question of whether the remedy of a special election is appropriate now that the normal election cycle has concluded, the results have been certified, and the office has been filled. Again, therefore, we would deem any request for a new election to be forfeited. See *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 33    Under Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1998), a reviewing court may, in its discretion, and on such terms as it deems just,

> "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and grant any relief, including a remandment, a partial reversal, the order of a partial new trial, the entry of a remittitur, or the enforcement of a judgment, that the case may require."

This rule is frequently cited to support the familiar proposition that waiver and forfeiture rules serve as an admonition to the litigants rather than a limitation upon the jurisdiction of the reviewing court and that courts of review may sometimes override considerations of waiver or forfeiture in the interests of achieving a just result and maintaining a sound and uniform body of precedent. See, *e.g.*, *Daley v. License Appeal Comm'n*, 311 Ill. App. 3d 194, 200 (1999); *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967). The rule does not, however, nullify standard waiver and forfeiture principles. The partially dissenting justice, himself, has made the point that while our case law is permeated with the proposition that waiver and forfeiture are limitations on the parties and not on the court, that principle is not and should not be a catchall that confers upon reviewing courts unfettered authority to consider forfeited issues at will. See *People v. McCarty*, 223 Ill. 2d 109, 162-64 (2006) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.).

¶ 34    We repeat a point we recently reiterated in our unanimous opinion in *People v. Givens*, 237 Ill. 2d 311 (2010):

> " 'In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. *** [A]s a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." ' " *Givens*, 237 Ill. 2d at 323-24 (quoting *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008)).

Accordingly, when cases come to us, "[w]e normally decide only questions presented by the parties." (Internal quotation marks omitted.) *Givens*, 237 Ill. 2d at 324 (quoting *Greenlaw v. United States*, 554 U.S. at 244). And

> " '[w]hile a reviewing court has the power to raise unbriefed issues pursuant to Supreme Court Rule 366(a)(5), we must refrain from doing so when it would have the effect of transforming this court's role from that of jurist to advocate. [Citation.]

Were we to address these unbriefed issues, we would be forced to speculate as to the arguments that the parties might have presented had these issues been properly raised before this court. To engage in such speculation would only cause further injustice; thus we refrain from addressing these issues *sua sponte*.' " *Givens*, 237 Ill. 2d at 324 (quoting *People v. Rodriguez*, 336 Ill. App. 3d 1, 14 (2002)).

¶ 35	In arguing against our reliance on principles of waiver or forfeiture, the partial dissent makes much of the questions that were asked (or not asked) by members of this court during oral argument. We note, however, that the purpose of questioning during oral argument is simply to help the justice asking the question to better understand the controversy. Questions by the court are not and have never operated as a limitation on the grounds the court may ultimately invoke in resolving a case.

¶ 36	Wholly aside from these issues, we must also point out that, in terms of remedies, we are not writing on a clean slate. While applicability of section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) to the situation present here may present a novel question, the issue of when an election challenge becomes moot does not. It is well established under Illinois law that the conclusion of an election cycle normally moots an election contest. The author of the partial dissent made the very point in his dissent in *McDunn v. Williams*, 156 Ill. 2d 288 (1993), where he correctly observed that

> "[c]ourts have repeatedly found issues concerning elections moot where the elections had already occurred. In each of these cases, the court reasoned that the occurrence of the election prevented the court from granting effective relief. (*People ex rel. Lawrence v. Village of Oak Park* (1934), 356 Ill. 154; *People ex rel. Chancellor v. Sweitzer* (1928), 329 Ill. 380.) Thus, 'when the election took place, the case became moot.' *People ex rel. Knight v. Holzman* (1968), 98 Ill. App. 2d 126, 127-28, citing *Sokolowski v. Board of Election Commissioners* (1967), 89 Ill. App. 2d 60; accord *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917; *Bartos v. Chicago Board of Elections* (1989), 191 Ill. App. 3d 937." *McDunn v. Williams*, 156 Ill. 2d at 345 (Freeman, J., dissenting).

Based on this long line of cases, the partially dissenting justice concluded that the challenge in *McDunn* should likewise be deemed moot. *McDunn v. Williams*, 156 Ill. 2d at 345-46 (Freeman, J., dissenting).[3]

¶ 37	The democratic principles underlying our electoral system noted by the partial dissent are always implicated when questions of ballot access arise. What the partially dissenting justice

---

[3]We note, parenthetically, that our resolution of the mootness issue here is in no way inconsistent with the court's disposition in *McDunn*. The factors informing the court's conclusion that *McDunn* was not moot were set forth in detail in the court's opinion. *McDunn v. Williams*, 156 Ill. 2d at 325-29. *McDunn* involved unique and unprecedented circumstances requiring direct intervention by our court to remedy a situation where two judges ended up occupying a single vacancy. The factors which led us to find that the *McDunn* case was not moot are simply not present here.

has failed to do is provide some legally valid reason, based on the actual record before us, as to why this particular case should be exempt from the normal rule that ordering new elections is an extreme remedy rarely ordered by the courts of Illinois.

¶ 38    The partial dissent raises, *sua sponte*, the specter that the objection process was abused in this case for political purposes. We note, however, that no claim has been made that Jackson's objection and the manner in which it was processed by the Election Board did not conform, in all respects, to statutory requirements. Moreover, the evidence cited by the partial dissent consists of little more than a chronology of the steps that were followed in this case in resolving Jackson's objection.

¶ 39    Unquestionably, the time between the filing deadline and the election was brief, but it is brief in every election contest. That is the way the legislature has structured the system. Under the established statutory framework, the window for bringing and resolving challenges is always small. Our experience has been that those responsible for processing those challenges in Chicago and elsewhere are well aware of the time constraints and strive to adhere to them. That was certainly the case here, as evinced by the fact that Jackson's challenge was considered by the Election Board and underwent two full levels of judicial review in less than three months, all before the polls opened on February 22.

¶ 40    In a further effort to find support for his view that the case should not be deemed moot, the partial dissenter looks to section 2A-1(e) of the Election Code (10 ILCS 5/2A-1(e) (West 2008)), which provides that "[i]n the event any court of competent jurisdiction declares an election void, the court may order another election without regard to the schedule of elections set forth in this Article." Again, however, that statute has not been invoked by any party to these proceedings, including Earls. The first mention of it came from the partial dissenter, who raised it *sua sponte* in the separate opinion he is filing today.

¶ 41    That Earls, herself, chose not to base any part of her argument on the statute is not surprising. For one thing, the statute applies, by its terms, only where an election has been declared void by a court of competent jurisdiction. In this case, no court has declared the February 22, 2010, election for 28th Ward alderman to be void and no party has asked this or any lower court to declare that election void. For another thing, the statute has never been employed by any court of review under facts analogous to those present here. That is why the partial dissent cites no Illinois case law that supports its position.

¶ 42    In *Reyes v. Bloomingdale Township Electoral Board*, 265 Ill. App. 3d 69 (1994), the appellate court did invoke section 2A-1(e) of the Election Code to order a special election for township supervisor after the regular election had concluded, but that case is clearly distinguishable. The original election in *Reyes* was declared void based on the determination that the local electoral board had exceeded its statutory authority in the course of the proceedings which led to the exclusion of a candidate from the ballot. In this case, by contrast, and as will be discussed more fully below, the Election Board acted correctly under the law. It properly rejected the effort to exclude Earls' name from the ballot, and its actions therefore did not result in the election being declared void following judicial review. We note, moreover, that even in *Reyes* a new election was never actually conducted. The appellate court ultimately vacated that portion of its judgment ordering a new election when

the candidate who had been excluded from the ballot by the electoral board's unauthorized action decided to withdraw her candidacy. *Reyes v. Bloomingdale Township Electoral Board*, 265 Ill. App. 3d at 73-74.

¶ 43 Although any request for a new election in this case has been forfeited and the conclusion of the election cycle would normally render this election contest moot, that does not end our inquiry. As noted earlier in this opinion, Earls' petition for leave to appeal asked, in the alternative, that we resolve the underlying legal dispute under the public interest exception to the mootness doctrine. This request is well taken.

¶ 44 The public interest exception to the mootness doctrine allows a court to reach the merits of a case which would otherwise be moot if the question presented is of a public nature, an authoritative resolution of the question is desirable for the purpose of guiding public officers, and the question is likely to recur. *Wisnasky-Bettorf v. Pierce*, 2012 IL 111253, ¶ 12; *Goodman v. Ward*, 241 Ill. 2d at 404. These criteria have been satisfied here. The appeal raises a question of election law, which inherently is a matter of public concern. The specific issue presented, whether a determination that a candidate for municipal office owes more in property tax than he or she had paid means that the candidate owes a debt to a municipality within the meaning of section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)), is a question which is likely to recur in future municipal elections. Moreover, a ruling by this court will aid election officials and lower courts in promptly deciding such disputes in the future, thereby avoiding the uncertainty in the electoral process which inevitably results when threshold eligibility issues cannot be fully resolved before voters begin casting their ballots.

¶ 45 Circumstances comparable to those present in this case were before our court in *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200 (2008), where we were also called upon to consider the question of eligibility for municipal office under section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) after the election in question had passed. Applying the same "public interest exception" factors just discussed, we concluded in *Cinkus* that the appeal should not be dismissed as moot. *Cinkus*, 228 Ill. 2d at 208. There is no reason to reach a contrary conclusion here.

¶ 46 Where, as here, judicial review of an electoral board's decision is sought pursuant to section 10-10.1 of the Election Code (10 ILCS 5/10-10.1 (West 2010)), the proceeding is in the nature of administrative review. *Cinkus*, 228 Ill. 2d at 209-10. When such proceedings reach our court on appeal, it is the election board's decision, not the decision of the circuit or the appellate court, which we review. *Id.* at 212.

¶ 47 The standard of review we apply to an election board's decision depends on what is in dispute, the facts, the law, or a mixed question of fact and law. *Cinkus*, 228 Ill. 2d at 210. Where the historical facts are admitted or established, but there is a dispute as to whether the governing legal provisions were interpreted correctly by the administrative body, the case presents a purely legal question for which our review is *de novo* (*Hossfeld v. Illinois State Board of Elections*, 238 Ill. 2d 418, 423 (2010)), a standard we have characterized as "independent and not deferential" (internal quotation marks omitted) (*Goodman v. Ward*, 241 Ill. 2d 398, 406 (2011)). This is such a case. The salient facts are uncontroverted. The issue

-12-

is whether, given those facts, the Election Board correctly concluded that Earls was not ineligible for the office of alderman in the 28th Ward of the City of Chicago under controlling law and that her name could therefore appear on the ballot for the February 22, 2011, municipal election as a candidate for that office.

¶ 48    In assessing whether the Election Board construed section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)) properly, we are guided by familiar principles. The primary goal of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the intention of the legislature. The best indication of legislative intent is the language used in the statute itself. The statute should be evaluated as a whole, with each provision construed in connection with every other section. When the statutory language is clear, we must apply the statute as written without resort to other tools of construction. *Cinkus*, 228 Ill. 2d at 216-17

¶ 49    Section 3.1-10-5(b) of the Illinois Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)), the statute at the center of this litigation, provides that a person "is not eligible for an elective municipal office if that person is in arrears in the payment of a tax or other indebtedness due to the municipality." As noted earlier in this opinion, the Election Board ruled that this statute was not an impediment to Earls' eligibility to run for the Chicago city counsel because the only evidence of indebtedness presented here pertained to real estate property taxes and, in the Election Board's view, real estate property taxes do not constitute a tax or other indebtedness due to a municipality. They are an obligation owed to the county.

¶ 50    We believe that the Election Board's construction of the law is correct. The obligation of citizens to pay taxes is purely a statutory creation, and taxes can be levied, assessed and collected only in the manner expressly spelled out by statute. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 295 (2010). The statute governing taxation based on ownership of real estate in Illinois is the Property Tax Code (35 ILCS 200/1-1 *et seq.* (West 2010)). Under the system established by the Property Tax Code, local taxing bodies such as the City of Chicago merely determine the total amount of revenue they will need to raise from property taxes and then certify levies in that amount to the clerk of the county in which they are located. See 35 ILCS 200/18-15 (West 2010). For purposes of the present discussion, this is the extent of their authority with respect to property taxes. Local taxing bodies do not determine property tax rates, they do not establish the amount of property taxes individual property owners will be required to pay, and they play no role in the collection of property taxes from property owners. These functions are performed, instead, by county (or sometimes township) authorities. See 35 ILCS 200/18-15 to 18-45, 19-5 to 19-80, 20-5 to 20-260, 21-5 to 21-445 (West 2010).

¶ 51    While tax bills issued by county tax collection authorities are required to include, along with a statement of the total tax rate and total amount of tax due, an itemized statement showing "the rate at which taxes have been extended for each of the taxing districts in the county in whose district the property is located" (35 ILCS 200/20-15 (West 2010)), the itemization merely serves to inform property owners how the aggregate property tax rate was computed and how the tax revenues will ultimately be allocated. The Property Tax Code does not give property owners the option of making direct payments to the individual taxing bodies for the share of the tax extended by county taxing authorities attributable to those

individual taxing bodies. Correspondingly, individual taxing bodies have no right to seek payment directly from taxpayers for their share of the tax bill. Under the Property Tax Code, property taxes may only be collected by county (or sometimes township) authorities (see 35 ILCS 200/19-5 to 19-80, 20-5 to 20-260 (West 2010)), and the obligation to pay property tax may only be satisfied by tendering payment to the county (or sometimes township) authorities (see 35 ILCS 200/20-25, 20-40 (West 2010)). If the property owner fails to make the requisite payment to the county (or the township, as the case may be), those collection officials, and not the individual taxing districts, have the exclusive right to declare the payment delinquent and initiate appropriate enforcement measures, including, if necessary, application for judgment and order of sale of the property to pay the taxes and special assessments. See 35 ILCS 200/21-5, 21-180 (West 2010). In situations where county tax authorities fail to properly and promptly disburse the tax revenue they have collected to the local taxing districts whose levies served as the basis for the county's property tax bills, the local taxing districts' sole recourse is to "prosecute suit against any collector or other officer collecting or receiving funds for their use, by suit upon the bond, in the name of the People of the State of Illinois, for their use, in the circuit court." 35 ILCS 200/20-155 (West 2010). The local taxing bodies have no authority to look past the county tax collection authorities and seek redress directly from individual taxpayers.

¶ 52     While local taxing districts are the ultimate beneficiaries of the property tax system, it is therefore apparent that under that system, property owners owe an obligation to pay their taxes to county (or sometimes township) tax collection authorities, and the county (or township) tax collection authorities, in turn, have an obligation to disburse the tax revenues they receive to the local taxing bodies. The property owners, however, have no obligation to make any property tax payments directly to the local taxing bodies. Such payments are owed and payable solely to county (or sometimes township) tax collection authorities. That being the case, property taxes cannot be deemed a "tax or other indebtedness due to [a] municipality" within the meaning of section 3.1-10-5(b) of the Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)). The Board of Elections was therefore correct when it concluded that the additional property tax Earls and her husband paid after homestead exemptions on two of their properties were challenged did not render Earls ineligible to hold municipal office and ordered that Earls' name appear on the ballot for election to the office of alderman for the 28th Ward.

¶ 53     In light of this conclusion, it is unnecessary for us to address Earls' additional argument that even if property tax falls within the ambit of section 3.1-10-5(b) of the Municipal Code (65 ILCS 5/3.1-10-5(b) (West 2010)), she could not be considered to have been "in arrears" on the payment of her property tax obligations at the time her nomination papers were due and filed. Nor is it necessary for us to consider an alternative argument that property taxes do not fall within the terms of section 3.1-10-5(b) because that statute was only intended to disqualify prospective candidates who are in arrears in the payment of personal obligations owed to a municipality and there is no personal liability for delinquent real estate taxes (*People ex rel. McDonough v. Chicago, Milwaukee, St. Paul & Pacific R.R.*, 354 Ill. 438, 442 (1933)) because, under Illinois law, such taxes are not a personal obligation (*Chodl v. Chodl*, 37 Ill. App. 3d 52, 54 (1976)) but merely a lien against the real estate on which the taxes

have been assessed (*In re Estate of Light*, 385 Ill. App. 3d 196, 200-01 (2008)).

¶ 54                                    CONCLUSION

¶ 55    For the foregoing reasons, the Election Board did not err when it denied Jackson's objection to Earls' nomination papers. The Election Board's decision was properly upheld by the circuit court, and the appellate court should not have overturned the Board's decision on review. The judgment of the appellate court is therefore reversed.

¶ 56    Reversed.

¶ 57    JUSTICE FREEMAN, concurring in part and dissenting in part:

¶ 58    I agree with my colleagues in the majority that Carmelita Earls' name should not have been removed from the ballot in the February 2011 aldermanic election. I join fully in that portion of today's opinion. *Supra* ¶¶ 47-52.

¶ 59    I cannot agree, however, with the court's determinations that Earls forfeited her request for a special election, that relief is therefore unavailable, and that, as a result, this case is moot and resort to the public interest exception is necessary to reach the merits. *Supra* ¶ 44. Earls did *not* forfeit her request for a special election. Indeed, she has consistently sought that relief since the completion of the February 2011 election. The Election Code allows this court to order a special election and I would grant that relief here. I therefore must dissent from that portion of today's opinion which denies Earls any relief.

¶ 60                                         I

¶ 61    Throughout the pendency of this appeal in this court, Earls has requested this court to order a special election. Today's opinion holds Earls has forfeited her right to seek the remedy of a special election. And, because of the forfeiture, and because the February 22, 2011, election has passed, the court concludes that relief is unavailable. Two reasons are advanced for the forfeiture. First, the court holds that Earls' request for "a post-April 5 election," *i.e.*, a special election, is not "properly before" it because Earls failed to include such a request in her petition for leave to appeal. *Supra* ¶ 32. Second, the court states that Earls failed in her brief to present argument and authority on "whether the remedy of a special election is appropriate" as is required under Supreme Court Rule 341(h)(7). *Supra* ¶ 32. I strongly disagree with these conclusions.

¶ 62    Forfeiture, as this court has said, is the "failure to make the timely assertion of [a known] right." (Internal quotation marks omitted.) *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007) (quoting *People v. Blair*, 215 Ill. 2d 427, 444 n.2 (2005)). See also *JPMorgan Chase Bank, N.A. v. Earth Foods, Inc.*, 238 Ill. 2d 455, 475 (2010) (noting that forfeiture is "the failure to comply timely with procedural requirements in preserving an issue for appeal"). Forfeiture rules apply both in the civil and the criminal contexts. *Gallagher*, 226 Ill. 2d at 229.

¶ 63    One of the basic principles in our forfeiture jurisprudence is that a party can forfeit the argument of forfeiture by failing to argue it in its brief: that is, forfeiture as a point of

argument may, itself, be forfeited. That is what happened here. Jackson did not argue in her brief that Earls failed to include the request for a "post-April 5" special election in her petition for leave to appeal. As such, Jackson has forfeited the opportunity to claim forfeiture. See *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) (and cases cited therein). Nor did Jackson argue in her brief that Earls' brief had violated Rule 341(h)(7) or otherwise seek sanctions for the violation. The court overlooks Jackson's own forfeiture of forfeiture, and instead raises the issue on its own. I address each of the court's points in turn.

¶ 64                    *Failure to Include Request for Special Election*
                        *in the Petition for Leave to Appeal*

¶ 65    The reason Jackson did not argue forfeiture is because Earls plainly requested the remedy of a special election in her petition for leave to appeal (PLA). In her PLA, Earls maintained the following:

> "Although the General Municipal Election of February 22, 2011 has occurred, the city of Chicago is still scheduled to have run-off elections for at least 14 various wards throughout the city on April 5, 2011. The Court could order a special election between Candidate Earls and [the] person who received the most votes in the February 22, 2011 election, if the Court was to reverse the lower court and determine that Candidate Earls' name should have been on the ballot." Appellant Brief at 9.

¶ 66    There is nothing in this statement to indicate that Earls specifically tied the remedy of a special election to the April 5 date and no other. Rather, the statement is nothing more than an acknowledgment of how this court could remedy the situation given an already scheduled election date on which a number of runoff contests were scheduled to be held. In other words, the April 5 date was a possibility that the court could consider for the special election she requested. This is understandable since Earls filed the PLA in March 2011, one month before the runoff elections were to be held across the city.

¶ 67    The court, however, characterizes Earls' PLA as having limited, in some way, the remedy of a special election to the April 5 date so that, once that date passed, the remedy became forfeited because Earls mentioned no other date in her PLA. Earls did *not* limit her request to a date certain. Earls specifically argued that the remedy of a special election was necessary because the appellate court wrongfully ordered the removal of her name from the ballot. She argued that she had been properly nominated by the voters of the 28th Ward for the office of alderman, that her name should have been on the ballot, and that the voters deserve to be given the opportunity to vote for her. She did not argue that such an opportunity be limited to only one date. The court today reads a narrow limitation into Earls' PLA that is simply not there.[4]

---

[4]As I have pointed out before, it is especially wrong for this court to engage in such a narrow reading because ours is "not a court to which the strictures of our own rules or the doctrine of procedural default are scrupulously honored." *People v. Robinson*, 223 Ill. 2d 165, 186 (2006) (Freeman, J., dissenting upon denial of rehearing). This court "routinely addresses arguments in the face of procedural irregularities, which would otherwise render the claims defaulted." *Id.* (and cases

¶ 68    In addition to misreading the PLA, the court compounds the problem by stating that

"Though the position Earls took in her brief paralleled the approach she advanced in her petition for leave to appeal, remarks made by Earls' appellate counsel at oral argument indicate that his client's position has actually changed. Earls' request for a special election is no longer contingent on the court's ability to rule prior to Chicago's April 5, 2011, runoff election. Rather, Earls asserts that a new election for 28th Ward alderman could and should be ordered even though the April 5 runoff elections have long since concluded." *Supra* ¶ 31.

Again, I disagree.

¶ 69    During the course of the 47-minute oral argument, on January 18, 2012, only one question from the bench raised the notion of forfeiture. Justice Thomas asked Earls' attorney:

"What type of relief are you seeking? In your brief, you talk about a special election if Earls prevails, but you cite no authority. So, if we do agree with your argument on the merits, why wouldn't the remedy of a special election be waived because you did not give this court any authority in support of it?

Earls' attorney answered:

"Earls would like a special election. *Cinkus* is a new case and it is the first we are dealing with under these facts. I do not believe that the special election is waived."

Justice Thomas then asked:

"So you are saying it is an issue of first impression and we should find that a special election is the appropriate remedy?"

Earls' attorney responded, "Yes."

¶ 70    Justice Thomas' question is important for a number of reasons. First, it raised, for the first and only time during oral argument, principles of forfeiture. Second, it indicated that he understood that Earls had, in fact, requested a special election. His question, at the time, reinforced my own belief that Earls was requesting a special election and that she did not consider the matter to have been mooted by the passing of the February 2011 election.

¶ 71    Importantly, the question *did not* raise the possibility that Earls' PLA limited her request to the April date indicated in today's opinion. It may be that the other members of the court did not have the same understanding as I did at that time—and I mean no criticism in that—but there can be no question that they understood that fact as soon as Justice Thomas asked the question.

¶ 72    Despite the fact that it is the court itself which first notes that "remarks made by Earls' appellate counsel at oral argument" establish that Earls' position with respect to the remedy "has actually changed" (*supra* ¶ 31), the court states that I "make[ ] much of the questions that were asked (or not asked) by members of this court during oral argument." *Supra* ¶ 35. The court then notes that "the purpose of questioning during oral argument is simply to help the justice asking the question to better understand the controversy" (*supra* ¶ 35), thus

cited therein).

-17-

implying that it is improper for me to bring up the questions that concerned forfeiture. From my years on the bench, I know full well that oral argument can play an important part in an appeal because attorneys have, at times, conceded points during the argument that were not conceded in the written brief. Therefore, I know that the argument does have a substantive component that goes beyond just mere questioning. This is why I share the view of former United States Supreme Court Justice Byron White that oral argument is "more than a ritual extension of due process to the parties." Byron R. White, *The Work of the Supreme Court: A Nuts and Bolts Description*, 54 N.Y. St. B.J. 346 383 (1982). As Justice White explained,

> "It is then that all of the Justices are working on the case together, having read the briefs and anticipating that they will have to vote very soon, and attempting to clarify their own thinking and perhaps that of their colleagues." *Id*.

¶ 73    Justice Antonin Scalia echoed this view more recently when he stated that during oral argument, "[y]ou hear the questions of the others and see how their minds are working, and that stimulates your own thinking." Joseph W. Hatchett & Robert J. Telfer, *The Importance of Appellate Oral Argument*, 33 Stet. L. Rev. 139, 142 (2003). See also John M. Harlan, *What Part Does the Oral Argument Play in the Conduct of an Appeal?*, 41 Cornell L.Q. 6, 7 (1955) (explaining "oral argument gives an opportunity for interchange between court and counsel which the briefs do not give").

¶ 74    It is because I agree with these comments that I must emphasize that the exchange I have quoted above was the only one posed to Earls' attorney regarding forfeiture. Not one member of the court indicated through questioning that there was any underlying problem with the remedy requested in Earls' PLA. There was no "clarification" or "interchange" between court and counsel regarding the passage of the April 5 election, nor did Jackson's attorney seize on the issue during his argument. In fact, the April 5 date was never mentioned during the entire course of the argument.

¶ 75    Notwithstanding this fact, my colleagues state in today's opinion that at oral argument, Earls' attorney changed positions. That was not how I remembered the argument, and so I reviewed the argument in its entirety. I have quoted the only portion of the argument that discussed the doctrine of forfeiture in any way, and the passage refutes any notion that Earls' attorney changed positions with respect to the April 5 date during his presentation to the court. In this context, there is nothing improper about me referring to what was asked or not asked during the argument. I therefore cannot agree with my colleagues that appellate counsel's remarks during oral argument reveal a "changed" position regarding her request for a special election. *Supra* ¶ 31. Counsel's remarks at oral argument served only to reinforce my understanding of Earls' PLA—she has consistently sought from this court the remedy of a special election and she did not specifically limit the election to a particular date.

¶ 76    Moreover, if my colleagues believed that Earls' PLA sought a special election to be held on April 5 and on that date alone, then *oral argument* was the time to press Earls' counsel on the point. At the very least, "clarification" regarding Earls' position with respect to a special election should have been sought at that time so as to "better understand" (*supra* ¶ 35) her position. It is simply unfair to raise the matter now, eight months after argument, in this opinion, particularly when Jackson herself has not made an issue of it.

¶ 77    In sum, after reading both Earls' PLA and her brief, as well as Jackson's brief, and having participated in the oral argument, I can find no basis for today's conclusion that Earls' request for a post-April 5 special election is not properly before us because it was not included in her PLA.

¶ 78                    *Failure to Cite Authority for the Remedy*

¶ 79    The court also states while Earls presents ample argument and authority on the underlying question regarding the Board's rejection of Jackson's objections, she has "offered none at all on the separate and distinct question of whether the remedy of a special election is appropriate." Therefore, the court deems "any request for a new election to be forfeited." *Supra* ¶ 32. According to the court, Earls' failure to cite authority precludes this court from granting the relief of a special election. I disagree.

¶ 80    Supreme Court Rule 366(a)(5) specifically allows a reviewing court, "in its discretion" and "on terms as it deems just," the power to

> "enter any judgment and make any order that ought to have been given or made, and make any other and further orders and *grant any relief*, *** that the case may require." (Emphasis added.) Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994).

¶ 81    According to the Historical and Practice Notes accompanying Rule 366, it was adopted in 1967 in order to allow reviewing courts "to consider issues not properly raised by the briefs, thus mitigating the impact of rule 341(e)(7),[5] which directs waiver of such issues." Ill. Ann. Stat., ch. 110A, ¶ 366, Historical & Practice Notes, at 36 (Smith-Hurd 1985). Rule 366 therefore acts to safeguard the court's ability to do justice in any given case. Obviously, a deficiency in briefing will never prevent a court from granting a remedy if the court believes justice requires the remedy to make the aggrieved party whole. Thus, I do not agree with my colleagues that a party can forfeit a specific request for relief since it is *always* within this court's power to fashion the appropriate remedy. The court's holding in this regard—that a remedy can be forfeited by a party—contravenes the fundamental principle underlying one of our own rules.

¶ 82    I note that the court cites to my partial dissent in *People v. McCarty*, 223 Ill. 2d 109 (2006), in what can only be characterized as an obvious attempt to embarrass me by trying to show that an inconsistency exists between my position in that case and my position today. *Supra* ¶ 33. In *McCarty*, the defendant failed to properly preserve the issue in the trial court. He also failed to include the issue in his PLA. Each member of this court agreed that the issue had not been included in the PLA, yet a majority reached the issue on its merits despite the omission from the PLA. A majority of the court also excused the defendant's failure to properly preserve the issue in the circuit court and addressed the issue on the merits, ruling against the defendant. I dissented from this portion of the opinion, stating no reason existed to excuse either of the forfeitures.

---

[5]Prior to its most recent revision, the current language contained in subsection (h)(7) could be found in what was then subsection (e)(7).

¶ 83    In this case, however, I do not agree with my colleagues that Earls omitted the issue from her PLA. As I pointed out earlier, Earls did include the issue. Therefore, with respect to the PLA forfeiture, there is no inconsistency today with my position in *McCarty*. Moreover, the court today states that the second reason that a forfeiture occurred here was due to Earls' failure to cite authority. *McCarty* did not address such forfeitures; rather, the defendant failed to properly preserve the issue in the trial court, which resulted in the default on appeal. Notwithstanding defendant's failure to preserve the issue properly, a majority of the court reached the merits, noting that "the rule of forfeiture is 'an admonition to the parties and not a limitation on the jurisdiction of this court.' " *McCarty*, 223 Ill. 2d at 142 (quoting *People v. Normand*, 215 Ill. 2d 539, 544 (2005), and citing *Hux v. Raben*, 38 Ill. 2d 223, 224-25 (1967)). In my dissent, I questioned the court's use of the principles of a civil case, *Hux v. Raben*, to excuse the defendant's procedural default as opposed to our plain-error rule, developed specifically for use in criminal cases. *McCarty*, 223 Ill. 2d at 163 n.6 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). That view is not inconsistent with my position in this case. While this is a civil case, I do not rely on the proposition that forfeiture is a limitation on the parties and not the court. Nor do I rely on the notion that the maintenance of uniform body of law would justify addressing Earls' special election remedy. Rather, I am relying on Rule 366, which authorizes this court to "grant any relief *** that the case may require." Indeed, my views on forfeiture and this court's application of the doctrine are the same today as they were in 2006:

> "[I]t is difficult to try to moor this court's application of the doctrine of procedural default to any objective criteria. Rather, opinions such as today's serve only to give the appearance that the court does whatever it wants to do in any given case ***." *Id.* at 164.

¶ 84    Jackson has not raised any type of forfeiture arguments, and the determination of whether the remedy of a special election is appropriate is not a very difficult one. Indeed, as I point out later in this dissent, the court speaks substantively to the issue. *Infra* ¶ 114. Additionally and perhaps most importantly, this case implicates the right to access to the ballot and the freedom of the people to elect candidates of their choice in open elections, one of the basic premises of American democracy. It would therefore "seem that the interests at stake here should command this court's attention and at least merit a discussion" on the merits. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 107 (Karmeier, J., dissenting, joined by Theis, J.). I would respectfully suggest that it is not I who is being inconsistent today.

¶ 85    In sum, I disagree with the court's two rationales for insisting that Earls' request for a special election is not properly before us.

¶ 86                    *Have Earls' Actions Precluded Substantive Review*
                        *As a Matter of Equity?*

¶ 87    Because today's opinion heavily emphasizes the equitable doctrine of forfeiture, the question that must be asked, at the end of the day, is a simple one: Did Earls in some way sit on her rights so as to render it inequitable for this court to consider, on the merits, granting

the specific relief that she has requested? A review of her actions indicates that the answer to that question is no.

¶ 88    Earls timely filed her nomination papers for the 28th Ward aldermanic election to be held on February 22, 2011. Jackson filed her objections on November 30, and Earls was served with them four days later. The Election Board then set the first hearing on the matter for December 6, 2010. At that hearing, Earls, appearing *pro se*, stated that she would be seeking to dismiss Jackson's petition. The hearing officer ordered a records examination be conducted in the matter. A briefing schedule was entered, and the matter was continued to December 13, 2010. Because the records examination had not been completed, Earls' motion to dismiss was twice continued to December 22 for an evidentiary hearing.

¶ 89    After the hearing officer concluded that the record examination revealed that Earls had more than enough valid signatures on her nomination petitions, the hearing then focused on three issues: (1) whether Earls had properly bound her nominating petitions in book form, as is required by the Election Code; (2) whether Earls resided at the address listed in her nominating papers; and (3) whether Earls owed debts to the City of Chicago invalidating her candidacy under *Cinkus*. At the conclusion of the evidentiary hearing, Jackson withdrew her allegations that Earls failed to reside at the address listed in her nomination papers. Two days later, the hearing officer issued a written report and recommendation in Earls' favor.[6]

¶ 90    The Election Board, in a written decision dated January 11, 2011, adopted the findings and recommendation of the hearing officer. Jackson's objections were overruled, and the Board ordered that Earls' name be printed on the official ballot for the February 22, 2011, municipal election.

¶ 91    Jackson then turned to the courts, seeking administrative review (10 ILCS 5/10-10.1 (West 2010)) in the circuit court of Cook County. The circuit court confirmed the Election Board's decision on January 27, 2011.[7] Jackson, however, did not file her notice of appeal until 11 days later, on February 7, 2011. I note that during these 11 days, Earls could do nothing except wait until Jackson commenced appellate proceedings. Once she did, the appellate court, acting on an expedited schedule, filed its decision at approximately 4 p.m. on Friday, February 18, 2011, the last business day before the polls were to open in Chicago at 6 a.m. on February 22, 2011. The appellate court ordered its mandate to issue immediately. This action precluded Earls, who, up to that point, had prevailed against Jackson's objection,

_____

[6]In it, he concluded that (1) Jackson had failed to produce any evidence regarding Earls' alleged failure to properly bind and secure the nomination petitions as required under the Election Code; (2) Jackson had failed to demonstrate that the payments she alleged Earls had not made were the type contemplated under the Illinois Municipal Code; and (3) Jackson's reliance on *Cinkus* was misplaced.

[7]It is important to note that on January 28, election officials sent the ballot to the printer. Although the Election Board is no longer a party to this appeal, it did file a brief in the appellate court, noting that it sent the ballot to the printer only after (1) the circuit court had ruled in this case and (2) this court had entered its ruling in "another citywide race." After the ballot went to print, early voting began on January 31, 2011, at 51 sites around the City of Chicago.

from seeking an emergency stay of the appellate court's judgment from that court.

¶ 92 Earls then filed in this court, at about 4:15 or 4:20 p.m., an emergency motion to stay the appellate court judgment and an emergency motion to expedite consideration of her petition for leave to appeal. These motions were not ruled upon by this court until February 23, 2011, after the election had taken place.

¶ 93 Earls certainly cannot be faulted for seeking such relief from this court. Yet, the court today does just that, by intimating that Earls could have asked the appellate court to recall its mandate and issue a stay *before* filing her futile eleventh-hour motions in this court at the end of the day. *Supra* ¶ 21. Do my colleagues truly mean to suggest that Earls should have wasted what little time was left in the business day by seeking such relief from a tribunal which had just ruled unanimously against her *and* took the further step of issuing its mandate immediately? Following the appellate court's decision, Earls was, for the first time since the challenge to her candidacy began on November 30, on the losing end, and she was running out of time to do anything about it. Her best bet was to seek a stay of the appellate court judgment from this court, just as mayoral candidate Rahm Emanuel had done several weeks earlier after his loss in the appellate court in another ballot challenge case arising in the Chicago mayoral race in the same primary election. See *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303 (2011). In fact, this court granted Emanuel relief similar to that sought by Earls. See *id.* (granting candidate Rahm Emanuel's emergency motion for stay expedited consideration less than 24 hours after it had been filed). I note further that Emanuel did not first request that the appellate court recall its mandate.[8] In sum, given the timing of the appellate court's decision, there was nothing more Earls could have done to preserve her right to remain on the ballot and her right to request a special election once February 22 came and went. Her PLA, brief, and oral argument all included requests for this specific remedy.

¶ 94 After reviewing all of Earls' actions in this matter, I see no evidence that she has, in any way, sat on her rights such that it would be inequitable to consider, on the merits, the remedy she has specifically requested of this court ever since the passage of the February 2011 election. I therefore disagree with the court that the remedy has been forfeited.

¶ 95                                                                 II

¶ 96 In light of my position on forfeiture, I must next consider Jackson's argument that the case is moot due to the passage of the February 22 primary election. As noted previously, the court agrees with Jackson that the passage of the election has mooted the case and reaches the substantive merits only by resort to the public duty exception.

---

[8] By implying that Earls was remiss for her failure to first ask the appellate court to recall its mandate, is the court today holding that such motions *must* be filed in such cases in the future? Given that there is no more time-sensitive case than a preelection ballot challenge, I do not see how such a requirement will aid in the speedy resolution of these cases. I also note that the court does not address this point in its opinion and future litigants should proceed accordingly in this matter.

¶ 97                                    *Mootness*

¶ 98        Jackson argues that the case is moot because the primary election has taken place. In order to address this argument, it is helpful to examine the historical context of preelection ballot challenges in Illinois.

¶ 99        Prior to 1967, there was no express provision in the Election Code for the review of an electoral board's decision as to the validity of nomination papers. See Ill. Rev. Stat. 1965, ch. 46, ¶ 10-10 (stating "decision of a majority of the electoral board shall be final"). The section was later amended to provide that the decision of a majority of the election board shall be final subject to judicial review as provided in section 10-10.1. Ill. Rev. Stat. 1969, ch. 46, ¶ 10-10. Section 10-10.1 provides that a party aggrieved by a decision of an electoral board may secure judicial review in the circuit court. 10 ILCS 5/10-10.1 (West 2010). No provision is made for further review of the circuit court's decision in section 10-10.1. Because the Election Code does not expressly adopt the provisions of the Administrative Review Act, that Act's appellate review provisions were held to be inapplicable to the Code. See *White v. Board of Appeals*, 45 Ill. 2d 378 (1970).

¶ 100       That the legislature did not expressly adopt the Administrative Review Act to the Election Code was viewed to be a "clear expression of the legislative intent that judicial review of the board's decision should terminate at the circuit court level." *Lawrence v. Board of Election Commissioners*, 45 Ill. App. 3d 776, 777-78 (1977). As our appellate court has observed, such intent "was doubtless based on the recognition that, because of the time necessary for the appellate process to run its course, any further appeals would invariably extend beyond the date of the election and render moot questions raised by the aggrieved parties." *Id.* at 778. See also *Petterson v. Scoville*, 83 Ill. App. 3d 746 (1980). Under this analysis, appeals from decisions of the circuit court in such cases were routinely dismissed for want of appellate jurisdiction.

¶ 101       In light of the recognition that judicial review of an election board's decision ended at the circuit court level, this court would entertain original actions for writ of *mandamus* so that candidates and objectors would receive a decision on the propriety of the objections to ballot access from the highest court of the state before election day. For example, in *Lewis v. Dunne*, an objector's petition was sustained by the Election Board on December 29, 1975, and candidate Martin Lewis' name was removed from the March 16, 1976, primary ballot for the office of judge of the appellate court in Cook County. *Lewis v. Dunne*, 63 Ill. 2d 48 (1976). While review of the Board's decision was pending in the circuit court pursuant to section 10-10.1, we granted Lewis leave to file an original action in this court. On January 19, 1976, oral argument was held, and we determined that the action should be treated as a writ of *mandamus*. Ruling from the bench, we awarded the writ and ordered that Lewis' name appear on the ballot, with a written opinion to follow. Two months later, on March 18, some two days after the primary election, we filed a written opinion, setting forth our reasoning for the award of the writ. *Id.* See also, *e.g.*, *Dooley v. McGillicudy*, 63 Ill. 2d 54 (1976) (awarding writ on January 19 while judicial review of the Board's decision was pending in the circuit court; candidate's name ordered to appear on March 16 primary ballot, with written opinion to follow).

¶ 102    Thus, the historical record reveals that judicial review was not intended by the legislature to go past the circuit court level for these types of preelection ballot challenges. Moreover, to protect a candidate's right to ballot access, this court would use the writ of *mandamus* prior to election day to ensure that candidates who were legally entitled to be on the ballot remained on the ballot. Under this process, mootness problems were avoided because the litigation was conclusively ended prior to election day.

¶ 103    All of that changed, however, in the early 1980s, when the appellate court declared section 10-10.1 to be an unconstitutional limitation upon the exclusive authority of our court to make rules governing appeals. *Gilbert v. Municipal Officers' Electoral Board*, 97 Ill. App. 3d 847, 848 (1981). Specifically, the court held that the statute was contrary to the plain language of Supreme Court Rule 301, which provides that every final judgment of a circuit court in a civil case is appealable as of right. *Id.* As a result, in *Gilbert*, the court held that it had jurisdiction to hear the appeal even though the election had taken place. With respect to questions of mootness, the court held that a special election on the referendum in question was unavailable because the Election Code did not specifically authorize one to be held. *Id.* at 849. Because effectual relief could not be granted, the court held that the case was moot. The court did not invoke the public duty exception to address the Election Board's determination that the petition for referendum filed by the plaintiff was invalid under the Code. *Id.*

¶ 104    *Gilbert*'s holding as to the unconstitutionality of section 10-10.1 effectively overruled cases like *Lawrence* and *Scoville*, which held that the appellate court lacked jurisdiction to hear such appeals. The remedy of *mandamus*, used by this court to conclusively end preelection ballot litigation, was no longer needed since a full appellate process now ensured that a case can reach this court for resolution. However, the adoption of a full appellate process for preelection challenges came at a cost: such challenges now can stretch out long past election day, as this case aptly demonstrates.

¶ 105    This fact raises the question: Does the completion of the election in question automatically moot any preelection challenge, as Jackson argues here? The answer is no.

¶ 106    The court in *Gilbert* recognized that mootness occurs only if effective relief is unavailable. In that case, which concerned a voter referendum, the court looked to whether it could grant effective relief in the form of a special election. After reviewing all of the pertinent Election Code provisions, the court determined that it was without authority under the Code to order the special election. For that reason, the court concluded the case was mooted by the election. Thus, the court in *Gilbert* did not rely on a blanket rule of mootness in preelection ballot challenges.

¶ 107    *Gilbert*'s mootness analysis was echoed by this court in *McDunn v. Williams*, 156 Ill. 2d 288 (1993). There, the court noted that an issue is moot if "no actual controversy exists or where events occur which make it impossible for the court to grant effectual relief." (Internal quotation marks omitted.) *Id.* at 325. In the context of an election case, the court stated the inquiry centers on the following question: "Has the general election made it impossible for a court to grant effectual relief?" *Id.* at 329. A majority of the court in *McDunn* believed that various provisions of the Election Code provided the means to grant effectual relief to both

candidates in that case despite the passage of the election. I dissented because I did not agree that those Code provisions could be read in the manner put forth by the majority. See *id.* at 344 (Freeman, J., dissenting) (agreeing with Justice Heiple that the Election Code did contain the proper authorization to place McDunn on the 1992 general election ballot). Without a statutory basis for relief, I could not agree that effective relief could be granted and it was for this reason that I was compelled to conclude, as my colleagues today remind me, "that the challenge in *McDunn* should *** be deemed moot." *Supra* ¶ 36.

¶ 108    Both *McDunn* and *Gilbert* applied the same inquiry to determine whether the passage of the election prevented effectual relief from being granted. Thus, it is that inquiry that controls the mootness determination in the context of election litigation. For that reason, Jackson's argument that the passage of the election, standing alone, served to moot this case is simply incorrect.

¶ 109    In seeking to once again imply that my position is somehow inconsistent with my past views, the court overstates my dissent in *McDunn*. I did not embrace, as the court appears to suggest, the broad view that all issues concerning an election become moot upon completion of the election. *Supra* ¶ 36. My position today remains at it was in 1993: mootness will be the outcome *if* the election prevents the court from granting effective relief. With this proposition, I agreed with the court in *McDunn*. What we differed on was the interpretation of the Code provisions upon which the court relied to grant the relief.

¶ 110    Finally, today's opinion therefore appears to embrace a blanket policy that preelection challenges become moot once the election takes place. *Supra* ¶ 36 (noting that I "correctly observed that '[c]ourts have repeatedly found issues concerning elections moot where the elections had already occurred' " (quoting *McDunn*, 156 Ill. 2d at 345 (Freeman, J., dissenting))). Such a blanket rule is incorrect. First, there is no statutory support for that position in the Election Code. Had the legislature intended for the completion of the election to moot all preelection challenges, it would have specifically stated so, particularly in the wake of *Gilbert*. Second, this position finds no support in our case law; indeed, both *McDunn* and *Gilbert* state the opposite. It is unfortunate that today's opinion now calls into question the validity of the analytical framework established in *McDunn* with respect to mootness in election cases, *i.e.*, whether the election has made it impossible for a court to grant effectual relief.

¶ 111    In sum, the completion of an election does not automatically, and in all cases, moot a preelection challenge. Rather, the court must look to see whether effective relief can be granted. This case is not moot because, as I explain below, the Election Code (see 10 ILCS 5/2A-1(e) (West 2008)) provides a basis to grant Earls the relief she has specifically requested.

¶ 112                                          *Remedy*

¶ 113    Earls has presented this court with an argument which demonstrates that the appellate court wrongly removed her candidacy from voters' considerations on February 22, 2011. In fact, it takes this court a mere five paragraphs to conclude the appellate court erred substantively in this case. *Supra* ¶¶ 49-53. Given my position in this case, the question for

me thus becomes whether a special election is the appropriate form of relief that should be granted.

¶ 114   Before I undertake my analysis concerning whether a special election is appropriate, I must address a comment directed to me in the court's opinion. Despite the fact that the court holds that Earls forfeited her request for a special election, it responds to the analysis contained in this section of my dissent, and in so doing, speaks to the merits. The following is a typical example:

> "The democratic principles underlying our electoral system noted by the partial dissent are always implicated when questions of ballot access arise. What the partially dissenting justice has failed to do is provide some legally valid reason, based on the actual record before us, as to why this particular case should be exempt from the normal rule that ordering new elections is an extreme remedy rarely ordered by the courts of Illinois." *Supra* ¶ 37.

¶ 115   I must point out that the court's determination that Earls forfeited her request for a special election means that the question of whether there is "some legally valid reason *** as to why this particular case should be exempt from the normal rule that ordering new elections is an extreme remedy rarely ordered by the courts of Illinois" is not at issue any longer. Whether my reasons for wanting to grant that relief are "legally valid" should be of no concern to my colleagues since they believe that question is not even properly before them. Either the special election remedy has been forfeited or it has not. The court's discussion of the merits indicates the court simply does not believe in its own forfeiture analysis.

¶ 116   Turning to section 2A-1(e) of the Election Code, the statute provides: "In the event any court of competent jurisdiction declares an election void, the court may order another election without regard to the schedule of elections set forth in this Article." 10 ILCS 5/2A-1(e) (West 2008). The appellate court's erroneous removal of Earls' name from the ballot deprived voters of the 28th Ward of the right to assert their preference for Earls notwithstanding the fact that she had fulfilled all statutory requirements for placing her name on the ballot, in addition to depriving Earls of her right to have been on the ballot. These deficiencies, under the circumstances, are sufficient to render the election void.

¶ 117   Section 21-30 of the Revised Cities and Villages Act of 1941 (65 ILCS 20/21-30 (West 2008) (Chicago Act)) provides that ballots to be used in aldermanic elections shall conform to the requirements of the Election Code. In turn, sections 16-3(a) and 17-6 of the Election Code require that the names of *all* candidates be printed on the ballot. 10 ILCS 5/16-3(a), 17-6 (West 2008); accord 65 ILCS 20/21-30(5) (West 2008) (same, Chicago). The purpose of the official ballot is to enable voters readily to indicate, in the prescribed form, the candidates of their individual choice. *People ex rel. Schnackenberg v. Czarnecki*, 256 Ill. 320, 327 (1912). The provisions of the Election Code are therefore designed "to afford to every legal voter the equal right with every other legal voter to cast his ballot freely for the candidates of his choice." *Id.* at 329. This obviously cannot occur if one or more names of candidates for a particular office are missing from the ballot.

¶ 118   The exclusion of Earls' name from the ballot rendered the ballots used in the 28th Ward aldermanic election defective and illegal. This court has held that "[m]ere inadvertence,

mistake, or ignorance in failing to observe each requirement [for form of ballot] does not necessarily void the ballot or the election, *so long as the voter's intention may be clearly ascertained, no voter is disenfranchised, fraud is not present, and secrecy of the ballot is not impaired*." (Emphasis added.) *Hester v. Kamykowski*, 13 Ill. 2d 481, 487 (1958). Here, the appellate court's error caused the ballots to become defective in that they no longer accurately listed the eligible candidates for alderman. There is no way to determine how the voters in the 28th Ward aldermanic election would have voted had they not been informed that Earls' name had been stricken from the ballot by court order and that any votes for her would not be counted. Such an endeavor would risk violation of the principle of secret ballots. Moreover, those voters who might have voted for Earls had they not been informed that their vote would not count were disenfranchised by the improper ballot. The freedom of voters to choose between qualified candidates is the very foundation of a valid election. Accordingly, the deficiencies in the ballot in this case "raise serious doubts as to whether the ballots were appropriate for obtaining a free and untrammeled expression of choice." *Hester*, 13 Ill. 2d at 488 (holding ballot deficiencies rendered election void). For this reason, the appellate court's improper exclusion of Earls' name from the ballot rendered the election for alderman of the 28th Ward void.

¶ 119    In yet another discussion of the merits of the remedial issue (again, an issue the court holds has been forfeited), the court rejects any voidness concerns in this matter because "the Election Board acted correctly under the law. It properly rejected the effort to exclude Earls' name from the ballot ***." *Supra* ¶ 42. I am not sure what point the court is attempting to make here. Yes, the Board of Elections properly rejected the objector's challenge, but the fact remains that Earls' name was not on the ballot and it should have been. Thus, voters who wanted to vote for Earls would not have been able to have their votes counted. In that regard, the ballot did not inform the voters in the 28th Ward of *all* the candidates for aldermanic office. The actions of the Board, taken pursuant to the appellate court's mandate, resulted in a deficient ballot that renders it impossible for this court to determine whether it was "appropriate for obtaining a free and untrammeled expression of choice." *Hester*, 13 Ill. 2d at 488. Indeed, courts from other jurisdictions have addressed this issue and reached the same conclusion. See *Ferguson v. Rohde*, 449 S.W.2d 758, 761 (Ky. 1970) (acknowledging that "an individual who has been nominated as required by law has an unqualified right to have his name appear on the ballot. The court should not speculate what the outcome of an election would have been if the voters had been afforded the free choice of candidates legally nominated for office. *** In that sense, the irregularity is sufficient to affect the result ***."); *Bowen v. Williams*, 117 So. 2d 710, 712 (Miss. 1960) (ordering new election based on a candidate's name missing from the ballot); *Gunaji v. Macias*, 2001-NMSC-028, ¶ 26, 130 N.M. 734, 31 P.3d 1008 (holding "[t]he omission of a candidate's name from the ballot has deprived some voters of that choice, thereby, strictly speaking, compromising the validity of the election"). For these reasons, I believe that my conclusion that the ballots rendered the election void is "legally valid." *Supra* ¶ 37.

¶ 120    Section 2A-1(e) does not list any specific criteria to be used in deciding whether to "order another election without regard to the schedule of elections set forth in this Article." Thus, it appears that the matter is one of judicial discretion, as the legislature used the word "may"

-27-

as opposed to "must" or "shall."

¶ 121    As Earls correctly points out, the interpretation of section 2A-1(e) is a matter of first impression for this court. However, our appellate court, in a case similar to this, did invoke the section when a candidate was "denied the candidate her rightful place on the ballot, where [the election board] incorrectly found her [nominating] petition to be insufficient by five signatures." *Reyes v. Bloomingdale Township Electoral Board*, 265 Ill. App. 3d 69, 73 (1994).[9] Before granting the remedy, the appellate court first declared the election void as a result of the board's "wrongful interference with the candidate's right of access to the ballot." *Id*. at 73. Having found the election void, the appellate court then ordered that a special election be held for the office in question.[10]

¶ 122    In yet another excursion into the merits of the purportedly forfeited remedial issue, the court today finds *Reyes* "clearly" distinguishable from the present case because, here, the Board "acted correctly under the law [and] properly rejected the effort to exclude Earls' name from the ballot" (*supra* ¶ 42), whereas in *Reyes*, the board improperly removed the candidate's name from the ballot (*id.*). But, as I have noted, the appellate court's error in this case had the same legal effect as the board's action in *Reyes*: Earls' name was removed from voters' consideration just as the candidate's was in *Reyes*. The harm in both cases was that the candidate was no longer in the race for the contested office. The court in *Reyes* considered that harm to have improperly interfered with the candidate's right of access to the ballot, as have the courts in the other jurisdictions that I noted above. The same is true in this case, and it is for this reason that *Reyes* is on point.

¶ 123    The court's discussion of *Reyes* deserves additional comment. Why is the court taking the time to distinguish a case that addresses an argument that, according to the court, is not properly before it?

¶ 124    In her brief, Earls argues that the right of ballot access must be honored and that the appellate court's action unduly infringed upon that right. She further argues that not only did the appellate court's action in this case disenfranchise her as a candidate, but it also served to disenfranchise every voter in the 28th Ward who would have considered voting for her, along with, I might add, all those who had, through early voting, already cast their ballot for her. Moreover, during oral argument, Earls' attorney reinforced this point by pointing out that the people of the 28th Ward *wanted* to have Earls on the ballot and signed nominating

---

[9]As I mentioned earlier, the court in *Gilbert* also addressed the statute, finding that the Election Code did not authorize its use in that case, thereby preventing the court from being able to grant effective relief.

[10]The appellate court filed its opinion on August 19, 1994. The opinion was later supplemented when, subsequent to August 19, the candidate formally withdrew her candidacy. In the supplemental opinion, the court stated that no special election need be held in light of the withdrawal of candidacy. *Reyes*, 265 Ill. App. 3d at 74.

petitions on her behalf.[11] These contentions weigh in favor of granting the remedy Earls has requested.

¶ 125    This court has long recognized that the "access to a place on the ballot is a substantial right not lightly to be denied." *Welch v. Johnson*, 147 Ill. 2d 40, 56 (1992). "It is now well recognized that the power of the States in *** the conduct of elections must be exercised in a manner consistent with the equal protection and due process clauses of the fourteenth amendment and with the interrelated right to associate for political purposes which is guaranteed by the first amendment." *Anderson v. Schneider*, 67 Ill. 2d 165, 171 (1977) (collecting cases). Further, article III, section 3, of the Illinois Constitution requires: "All elections shall be free and equal." Ill. Const. 1970, art. III, § 3. An election is "free" where the voters are exposed to no intimidation or improper influence, and where voters are allowed to cast their ballots as their own consciences dictate. *Moran v. Bowley*, 347 Ill. 148, 162 (1932). "It is the right of the people to elect any eligible person to an office" (*People ex rel. Hoyne v. McCormick*, 261 Ill. 413, 419-20 (1913)), and every eligible person has a corresponding right to be a candidate for any office. *Czarnecki*, 256 Ill. at 327. The rights of candidates and those of voters do not lend themselves to neat separation. State action affecting a candidate has some effect on the voter. *Anderson*, 67 Ill. 2d at 174 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). The interests involved are not limited to those of candidates because voters can assert their preferences only through candidates. Accordingly, the right of an individual to a place on the ballot is entitled to protection and is intertwined with the rights of voters. See *Lubin v. Panish*, 415 U.S. 709, 716 (1974); *Anderson*, 67 Ill. 2d at 174-75.

¶ 126    In my view, Earls' concerns for voter disenfranchisement are particularly resonant in this case. The Chicago ward in question is a predominantly African-American ward (roughly 84%), made up of neighborhoods such as West and East Garfield, Austin, Little Village, and part of Lawndale. The ward has been described as being economically challenged (see Garin Flowers, *28th Ward Among Worst Hit by Foreclosures*, Medill Reports, Northwestern University (Jan. 18, 2011), http://news.medill.northwestern.edu/ chicago/news.aspx?id=176403) and residents have complained of being left out of the political process. See, *e.g.*, WLS-TV, *The Race for the 28th Ward* (Feb. 14, 2011), http://abclocal.go.com/ wls/story?=news/politics&id=7958512; Cheryl V. Jackson, *Candidates Argue 28th Ward Could Be Showplace*, Chicago Sun Times (Feb. 20, 2011), http://suntimes.com/news/politics/3894758-418/candidate4s-strive-to-revive-west-sides-28th-ward.html. Being improperly deprived of the opportunity to vote for a candidate who earned a spot on a ballot can only risk deepening that complaint. I note that the eventual winner of the primary, Jason Ervin, an African-American, received 84.69% of the vote, while the lone remaining non-African-American candidate, William Siegmund, received 15%. Given the ward's racial demographics, the elimination of Earls, an African-American, from the race reduced the possibility that the African-American vote would be split and all but

---

[11]According to the findings and decision of the Election Board, Earls needed a minimum of 152 valid signatures required by law for placement on the ballot for the office of alderman. Earls collected 221 valid signatures.

eliminated any concern about a potential runoff election for Ervin. In other words, he became a "shoo-in." It is this fact that makes Earls' argument concerning voter disenfranchisement particularly compelling.

¶ 127    The additional problem in not granting a special election here is the possibility that the failure to act emboldens those who consider court action as an additional political tactic in a no-holds barred election campaign. It is no secret that "[e]lections are quintessentially political in nature." *Geer v. Kadera*, 173 Ill. 2d 398, 406 (1996). The court's treatment of the special election remedy encourages resort "to the valuable tool that challenging the ballot provides." Diana Novak, *Ballot Challenges, Election Law Protect Incumbents, Not the Ballot*, Medill Reports, Northwestern University (Mar. 2, 2011), http://news.medill.northwestern.edu/chicago/news.aspx?id=181362. According to political strategist and campaign advisor Thom Serafin: "A challenge can easily spell the end of a campaign. *** It could derail it. It could knock it off the tracks and end it very quickly." *Id.* Because "[t]here are few reasons a challenge can't be filed *** there is a way to make the rules work for you *** if you have the resources." *Id*. When abused, candidate challenges become "political tools" to "hijack" elections. *Id.*

¶ 128    Indeed, Earls, in her brief, argues that such tactics were at play in her case: "Who is to say that Alderman Ed Smith and the Cook County Assessor's Office were not aware of the information prior to Earls filing her nomination papers and held on to it until after the filing period so that they could, as the objector did, have Earls' name not placed on the ballot?" The evidence taken at the hearing indicates that Earls received from the City of Chicago department of revenue an "Indebtedness Statement," dated November 17, 2010, which indicated that it had performed a "thorough indebtedness investigation" and concluded that Earls was "not in arrears on any debt to the City of Chicago." Earls relied on this statement in filing her nominating papers by the November 22 filing deadline. On November 30, Jackson filed her objection, alleging that Earls had improperly taken a homeowner's exemption and was thus in arrears to the City of Chicago because she owed outstanding property taxes. At the time, Earls was unaware of any indebtedness. In December, she received a letter from the Cook County assessor's office, dated December 6, 2010, stating that the assessor, in conjunction with the current 28th Ward alderman, had determined that Earls had taken improper homeowner exemptions. The letter directed her to make payments to the county to bring the account into order. With respect to this point, the hearing officer, in his written report and recommendation, drew attention to "the timing of and the incumbent Alderman's role in transmitting the December 6, 2010 letter from the Cook County Assessor's office to [Earls]." Clearly, Jackson had knowledge on November 30 of a fact that county officials did not tell Earls until one week later in their letter of December 6. Jackson's objection culminated in the appellate court removing Earls from the election. As noted earlier, due to the timing of the court's decision, new ballots could not be printed, so each voter in the ward was given a piece of paper informing them of the court's decision and that any vote for Earls would not be counted. As one local newspaper reported, the appellate court's "11th hour decision means Earls' name will still appear on the already printed ballot on Tuesday, but no votes for her will be counted, making it a two person race." Cheryl V. Jackson, *Candidates Argue 28th Ward Could Be Showplace*, Chicago Sun-Times (Feb. 20,

2011), http://suntimes.com/ news/politics/389475-418/candidate4s-strive-to-revive-west-sides-28th-ward.html.

¶ 129    The court today discounts any concerns in this area, suggesting that everything that occurred in this case conformed to all statutory requirements for a preelection ballot challenge. It states:

> "Unquestionably, the time between the filing deadline and the election was brief, but it is brief in every election contest. That is the way the legislature has structured the system. Under the established statutory framework, the window for bringing and resolving challenges is always small. Our experience has been that those responsible for processing those challenges in Chicago and elsewhere are well aware of the time constraints and strive to adhere to them. That was certainly the case here, as evinced by the fact that Jackson's challenge was considered by the Election Board and underwent two full levels of judicial review in less than three months, all before the polls opened on February 22." *Supra* ¶ 39.

I disagree with all of these sentiments for a number of reasons.

¶ 130    First, my earlier review of the historical context of the statutory preelection ballot challenge reveals that what occurred here is not what the legislature intended. It was the judiciary's ruling on the unconstitutionality of section 10-10.1 that led to such challenges lasting beyond election day. The "window for bringing and resolving challenges" was judicially enlarged. Prior to *Gilbert*, the legislature originally structured the "system" to ensure that the "window" was firmly shut by the date of the election. The opinion in *Gilbert* did not address what impact the insertion of the full appellate process in such cases would have on the legislature's intention that such litigation be final by election day. It is this fact that allows the "system" to be used as a political tool.

¶ 131    My colleagues further suggest that the "system" worked the way it should in this case because Jackson's "challenge was considered by the Election Board and underwent two full levels of judicial review in less than three months, all before the polls opened on February 22." *Supra* ¶ 39. The problem with this statement is that the "system" worked in such a way that a person who was legally entitled to be on the ballot was kept off of it. Certainly, that is not what the legislature intended in creating the statutory preelection ballot challenge. Indeed, I submit that the legislature granted to the judiciary the statutory ability to order special elections for just these types of circumstances. See *McDunn*, 156 Ill. 2d at 337 (Miller, C.J., specially concurring, joined by Bilandic, J.) (noting that Election Code provides courts with ability to fashion remedies post-election when final judgment from a court cannot be rendered prior to election day).

¶ 132    I must also take issue with the court's statement that "[o]ur experience has been that those responsible for processing those challenges in Chicago and elsewhere are well aware of the time constraints and strive to adhere to them." *Supra* ¶ 39. I am unsure to what "experience" my colleagues allude. This court does not entertain many of these cases, but our most recent experiences reveal that people are being excluded from the ballot who should have been kept on. This case marks the third preelection ballot challenge case we have heard over the last 18 months, all arising from the February 2011 election. In one case, the

excluded candidate did not request a special election, instead arguing only that the case was moot and the public duty exception applied. *Wisnasky-Bettorf v. Pierce*, 2012 IL 111253. It is worth noting that this court found that the Board incorrectly removed the candidate from the ballot. In other words, voters were deprived of a choice in the election because the Election Board got it wrong.

¶ 133    The second case arose from the same primary election as this case. There, as noted earlier, this court granted a stay of the appellate court's order that candidate Rahm Emanuel's name should be removed from the mayoral ballot. In that case, the appellate court's opinion was filed on January 24, 2011. Even though the primary election was still several weeks away, this court entered an order on the next day, opting to use the briefs filed by the parties in the appellate court.[12] As noted earlier, Emanuel did not seek to recall the appellate court's mandate before seeking relief in this court even though the election was, as noted, several weeks away. We did not entertain oral argument. Ultimately, we filed our decision in the matter two days later, on January 27, 2011, holding that Emanuel's name should appear on the ballot. Fortunately for the *voters*, the "system" worked, and the litigation was conclusively finalized prior to election day. In this case, the same cannot be said. In all three cases, the losing party in the appellate court ultimately prevailed, meaning that each should have been on the ballot.

¶ 134    Another example of how the "system" works is the case of Dennis Kellogg, who sought to run for a Cook County judicial vacancy on the Democratic ballot in the March 16, 2004, primary election. The Election Board sustained a challenge to the validity of Kellogg's nominating papers, and the Board struck his name from the ballot. The circuit court confirmed the Board's decision on February 11, 2004. Kellogg filed a notice of appeal on February 19, 2004, in the appellate court. Due to an administrative error in the office of the clerk of the appellate court, the case was not brought to the attention of the presiding justice until March 23, 2004, some seven days after the primary election. *Kellogg v. Cook County Illinois Officers Electoral Board*, 347 Ill. App. 3d 666, 668 (2004). The appellate court noted these facts in its opinion and "regretfully" acknowledged that "a critical administrative error delayed this court's consideration of [Kellogg's] appeal." *Id.* at 668-69. It is not often that a reviewing court will be so frank in admitting the role it (or its subordinates) played in denying a party a prompt adjudication. Nevertheless, because of the court's forthrightness, we have yet another example of how the "system" works. The only good thing that can be said about *Kellogg* is that ultimately there was no harm caused by the delay because the appellate court concluded that the Election Board had correctly struck Kellogg from the ballot because his nominating papers failed to conform to the Election Code requirements.

¶ 135    Unlike my colleagues, I can take no comfort from that fact that at least two levels of judicial review were provided to Earls and Jackson, all before the polls opened on February 22. *Supra* ¶ 39. The "experiences" that I have with these cases do not instill in me the same

---

[12]We also entered an order directing the Board of Elections that if any ballots are printed while this court was considering the case, the ballots should include Emanuel's name as a candidate for mayor of Chicago.

confidence in the preelection ballot challenge system that my colleagues appear to have. Indeed, by unnecessarily addressing the merits, the court's comments reveal only that it has put its *imprimatur* on a system that can be used for political gamesmanship to result in the denial of ballot access to citizens legally entitled to run and the disenfranchisement of voters.

¶ 136    We hold today unanimously that Jackson's challenge should have been unsuccessful, but the court leaves unremedied the fact that what should have been a three-person election was a two-person contest. Today's decision does little to remove the perception held by many that elections, particularly those in Chicago, are often an insider's game and do not reflect the will of the people. The lack of an effective remedy in these types of situations will only encourage more last-minute election challenges that employ the strategy of "running down the clock" as election day approaches. Granting a special election in this case would go a long way to ensuring, in future instances, that in Illinois elections are decided by voters in the voting booth, and not by judges in the courtroom.

¶ 137    Finally, I note that Jackson has not offered any countervailing considerations regarding a special election that weigh against those presented by Earls. Jackson's argument is only that the election has mooted the case.[13] With no offsetting concerns identified by Jackson, and, as I recently noted, "because a candidate's access to the ballot is favored by law" (*Maksym*, 242 Ill. 2d at 334 (Freeman and Burke, JJ., specially concurring)), I believe a special election, as allowed by the legislature in section 2A-1(e) of the Election Code, is the appropriate remedy in this case.


¶ 138                                            III

¶ 139    In light of the above, I would remand the cause to the Board with instructions to conduct another election for the office of 28th Ward alderman with Earls, Jason Ervin, and William Siegmund as candidates, to be scheduled according to law. In the interim, the Chicago Act refers to the Municipal Code for the mechanism for filling aldermanic vacancies. 65 ILCS 20/21-22(b) (West 2008) (citing 65 ILCS 5/3.1-10-51 (West 2008)).


¶ 140    JUSTICE BURKE joins in this partial concurrence and partial dissent.

---

[13]Jackson contends only that Earls is not entitled to "any relief as to a special election."