2020 IL App (2d) 180726
No. 2-18-0726
Order filed April 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF SHELLEY K. MONTGOMERY, | ) ) ) | Appeal from the Circuit Court of Lee County. |
| Petitioner-Appellant, | ) ) | |
| and | ) ) | No. 01-D-96 |
| BRIAN K. MONTGOMERY, | ) ) ) | Honorable Jacquelyn D. Ackert, |
| Respondent-Appellee. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's judgment regarding holding respondent in contempt for failing to report changes in address and employment and failing to pay his share of medical and extracurricular expenses was neither against the manifest weight of the evidence nor an abuse of its discretion; likewise, its decision not to award petitioner attorney fees was not an abuse of discretion. Finally, the trial court did not err in ordering an offset for respondent's overpayment of child care expenses against the amounts he owed for his share of unpaid medical and extracurricular expenses.

¶ 2    Petitioner, Shelley K. Montgomery, n/k/a Shelley K. Vacek, appeals from the judgments

of the circuit court of Lee County on her postdissolution petition for adjudication of indirect civil

contempt against respondent, Brian K. Montgomery, and on his petition for reimbursement. The

trial court refused to hold respondent in contempt, but determined that he owed certain funds to

petitioner for his unpaid share of their child's medical and extracurricular expenses; the trial court also found that respondent had overpaid a significant amount for child care expenses even though the child ceased incurring documented child care expenses in 2009 and no longer needed child care in 2011 (by petitioner's own testimony). The trial court ordered that the overpayment be offset in part by the amounts respondent owed for medical and extracurricular expenses with the remainder owed by petitioner to respondent to be paid by petitioner taking over respondent's share of college expenses for the child until the overpayment was squared. Petitioner appeals, arguing that the trial court erred by declining to hold respondent in contempt for his undisputed violations of the judgment of dissolution, by failing to award her attorney fees incurred in prosecuting the contempt petition, and by ordering the offset of respondent's share of the expenses for what she termed to be a voluntary overpayment of child care expenses. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4      On May 17, 1997, the parties married. In 1999, the parties had a child, A.M. On April 19, 2002, the parties' marriage was dissolved. At the time of the dissolution, petitioner lived in Dixon, Illinois, and respondent lived in Saint Louis, Missouri.

¶ 5      The dissolution order provided that respondent was to pay petitioner "as and for child support a total sum of $250.00 every two weeks payable as provided by law." The parties were ordered to be "equally liable for child care expenses," and respondent was required to "pay the sum of $100.00 every two weeks as and for his ½ share of child care expenses." Further, the parties were ordered to "continue to be equally responsible for child care expenses until [A.M.] is no longer in need of child care."

¶ 6    The dissolution order also provided that the "parties shall equally divide any extracurricular expenses incurred on behalf" of A.M.  Additionally, the dissolution order required respondent to pay petitioner "one-half of her cost to provide medical insurance on behalf" of A.M., and that amount at the time of the judgment was $80 per month (and the insurance amount was never adjusted).  The order further provided that, after the utilization of insurance for A.M.'s medical expenses, "the parties hereto shall equally divide all medical, dental, hospital, surgical, optical, orthodontic and pharmaceutical expenses incurred for and on behalf" of A.M.

¶ 7    Mixed in with the monetary provisions, the dissolution order further provided:

"[Respondent] is ordered to report to [petitioner] and to the Clerk of the Court within 10 days of each time he obtains new employment, and each time his employment is terminated for any reason.  The report shall be in writing and shall, in the case of new employment include the name and address of the new employer.  Failure to report new employment or the termination of current employment, if coupled with nonpayment of support for a period in excess of 60 days, is indirect criminal contempt.  [Respondent] and [petitioner] shall advise each other of a change in residence within five days of the change except when the Court finds that the physical, mental or emotional health of a party or that of a minor child, or both, would be seriously endangered by disclosure of the party's address."

¶ 8    The record suggests that, from the divorce to the present day, the parties' remaining relationship was tense and uncommunicative.  Beginning in June 2002, petitioner obtained a withholding order with respondent's then-employer for the amounts specified in the judgment of dissolution: $250 biweekly for support, $100 biweekly for child care, and $80 monthly for insurance for the child.  At that time, respondent had a child-support arrearage of $700, which was

memorialized in the order of dissolution. Petitioner does not contend that the arrearage was not eventually paid. At that time, June 2002, respondent resided and worked in St. Louis, Missouri, while petitioner resided in Dixon, Illinois.

¶ 9 From the dissolution to sometime in 2004, respondent exercised visitation with A.M. From 2004 to 2015, respondent discontinued his visitation, resuming when A.M. arranged visitation through her paternal grandmother (respondent's mother). A.M. never resided with respondent.

¶ 10 In October 2003, the parties exchanged communications about expenses incurred on behalf of the child. Petitioner mailed copies of the bills to respondent's address in St. Louis. Respondent replied via email, stating, "I know about the reimbursements, but I am trying to get the Jeep paid off and brought up to date [pursuant to the requirements of the judgment of dissolution]." Respondent also asked petitioner to "cut [him] a break," claiming that petitioner knew he would "make good on it."

¶ 11 In November 2004, petitioner contacted respondent via email regarding the October 2003 communications. Petitioner accused respondent of crying poor in 2003 and continuing to gratify his desires:

> "I hope this e-mail from over a year ago is familiar. You whined and cried about giving you a break then. I did. Since then you can afford to foreclose on your house and buy a new car every year. I figured it was time that you can start paying for your daughters [*sic*] expenses as your obligated too [*sic*]."

Respondent replied in kind, stating that he wished he "would have had [petitioner's] Jeep repossessed." Minutes later, respondent added, "Have fun when I loose [*sic*] my job and you loose [*sic*] $800/month in child support." Respondent followed up this bitter exchange with an inquiry

to his employer's security personnel, asking "How can we stop this harrassment [*sic*] on Government systems?" In his "harassment" inquiry, respondent provided his security personnel background information from his point of view interlaced with complaints about petitioner and her conduct, particularly complaining about her aggregating purportedly reimbursable expenses in the amount of $1,400 before sending him copies of the bills and demanding payment.

¶ 12    Petitioner did not again contact respondent until 2015. Petitioner later testified that she ceased her efforts at contacting respondent because she did not want to jeopardize respondent's security clearance or employment.

¶ 13    In 2006, respondent moved from St. Louis to North Carolina. He did not file with the court a notification of his change of address. While residing in North Carolina, respondent was deployed to Afghanistan. Upon his return, he moved to Washington D.C. and, after about 18 months, to Virginia. In approximately 2009, respondent moved to Michigan, where he continued to reside up to and through the proceedings in this matter. For none of his moves did respondent file with the court a notification of his change of address. Similarly, respondent did not give petitioner any contact information.

¶ 14    From the divorce until 2010, respondent was employed by the Central Intelligence Agency. At the time of the divorce, respondent earned approximately $40,000 to $45,000 per year. In 2009, respondent reported an annual gross income of over $79,000. In 2010, respondent resigned his position after accessing classified information utilizing a public account. As a result of his conduct, respondent pleaded guilty to a misdemeanor charge of unauthorized computer access. Respondent remained unemployed before finding full-time employment in 2012 with Baker Hughes and Great Plains Well Logging, both energy-sector companies.

¶ 15    From 2009 to 2011, petitioner did not receive child support payments from respondent. Once he resumed full-time work in 2012, he earned gross income of $112,000. In 2013, respondent began working for Devon Energy and earned gross income of more that $160,000. In February 2016, however, respondent was laid off from Devon Energy.

¶ 16    In March 2016, respondent emailed petitioner to inform her that he had been laid off by Devon Energy. In 2016, despite the layoff, respondent recorded gross income of nearly $121,000.

¶ 17    Respondent admitted that he did not notify petitioner or file with the court a notification any time his employment changed. Respondent, however, testified that, whenever his employment changed, he would notify the State, usually the Child Support Enforcement unit in Rockford, and he would arrange through his employer's payroll department to have the child support and related payments automatically deducted.

¶ 18    In January 2010, following his resignation from employment with the Central Intelligence Agency, respondent filed a petition for modification of child support on the basis that he was no longer earning income. Petitioner obtained counsel and discovery was initiated on the petition to modify. In May 2010, respondent's attorney withdrew, and in June 2010, respondent's petition to modify was dismissed for want of prosecution.

¶ 19    Petitioner recounted that, from the dissolution, she paid expenses for A.M. and then would submit them to respondent. Over time, as communication between the parties failed, petitioner bore the expenses for A.M. herself, such as insurance premiums, medical expenses, and extracurricular expenses; petitioner did not provide receipts to respondent because, she maintained, that she did not have respondent's address. Relevantly, regarding child care expenses, petitioner incurred and paid them through February 2009, while A.M. participated in child care programs at

petitioner's local YMCA. After February 2009, petitioner withdrew A.M. from the YMCA program and used individual babysitters occasionally and as needed. Petitioner had no receipts for the occasional babysitters. After A.M.'s twelfth birthday in 2011, petitioner no longer needed or used babysitters.

¶ 20    Petitioner asserts that, after the bitter email exchange in 2004, she had no further contact with respondent until 2015, when A.M. reinitiated contact with him and arranged a visit. Petitioner exchanged texts with respondent's wife concerning A.M.'s health and medical expenses. Further contact between petitioner and respondent occurred in 2016 as respondent personally visited A.M. during A.M.'s homecoming or prom. Petitioner testified that, because A.M. was present during the visits, she did not believe that it was appropriate to discuss expenses with respondent or to present him with bills or receipts of the expenses.

¶ 21    On October 17, 2016, petitioner, via counsel, contacted respondent concerning his arrearages in child support, medical expenses, insurance premiums, and extracurricular expenses. She also requested employment and contact information. In response, respondent retained counsel to negotiate on his behalf. Apparently, respondent's counsel was not sufficiently responsive to both respondent and petitioner and her counsel.

¶ 22    Sometime in March 2017, respondent decided to pay in full his child support obligations and related expenses. To that end, in March, he withdrew over $11,000 from his Fidelity IRA and earmarked it for the payment of child support arrearages and interest. In April and again in May 2017, respondent informed his counsel that he no longer required representation because he intended to pay his support obligations in full. Respondent also began communicating directly with petitioner's counsel in order to keep her apprised of his efforts to satisfy the arrearages. In

May 2017, respondent withdrew an additional $13,000 from his Fidelity IRA. Respondent sent the monies from his IRA to the Department of Healthcare and Family Services (Department).

¶ 23 Crossing in the mail, as it were, as respondent was trying to arrange payment for his arrearages, petitioner was growing frustrated with the lack or progress in resolving the child support arrearages. Ratcheting up the tension, on April 3, 2017, respondent filed in the court file a notice to produce and interrogatories. On April 11, 2017, petitioner filed her notice to produce. On April 12, 2017, petitioner filed her petition for indirect civil contempt against petitioner requesting that respondent be held in contempt for his failure to pay certain obligations under the judgment of dissolution, as well as respondent's failure to report to her his changes of address and employment. On April 17, 2017, petitioner deposited a check of over $11,000 from the State. According to petitioner, she had signed the petition for indirect civil contempt before she received the $11,000 check from the State; likewise, she was unaware of respondent's intentions until she actually received the check in the mail. Thereafter, about a month later in May 2017, petitioner received an approximately $4,800 check from the State, and a month after that in June 2017, petitioner received an approximately $8,200 check from the State, with the final check indicating that it was for interest.

¶ 24 In addition to respondent's payment efforts, his legal landscape continued to change. In mid-May, petitioner filed a petition for educational expenses and a motion to compel approximately five weeks after her notice to produce. At the end of May, respondent's attorney was granted leave to withdraw, and on June 7, 2017, respondent's new counsel appeared on his behalf. From the date of her appearance, respondent's new counsel appeared to remedy the communication issues between the parties and discovery began flowing.

¶ 25    While these legal and financial developments were occurring, in April 2017, A.M. turned 18 years of age.  In May 2017, A.M. graduated from high school.  On September 15, 2017, the parties entered an agreed order regarding the apportionment of A.M.'s college expenses.

¶ 26    On September 29, 2017, respondent filed his petition for reimbursement, alleging that he had overpaid child care expenses by nearly $21,400.  In his petition, respondent requested that the amount of the overpayment be used to offset any other expenses for which he was found responsible and owing.

¶ 27    On three dates occurring between November 2017 and January 2018, the trial court held an evidentiary hearing on petitioner's petition for indirect civil contempt and respondent's petition for reimbursement.  The evidence presented was as summarized above.  On March 20. 2018, the trial court entered its order by memorandum opinion.

¶ 28    The trial court quickly disposed of the issues of college expenses and attorney fees related to petitioner's motion to compel.  With respect to the college expenses, the court ordered the parties and A.M. each to pay one-third of A.M.'s cell phone expenses, automobile insurance expenses, and automobile maintenance expenses, but respondent was not required to pay anything toward the outstanding balance of the loan for A.M.'s automobile.  With respect to the attorney fees, the court ruled:

> "It is apparent to this Court that there were communication issues between [respondent] and Attorney Whitcombe [respondent's previous counsel] and Attorney Whitcombe and Attorney Considine [petitioner's counsel].  Although [respondent] did not file his own Motion to Compel, the court record shows that the first set of discovery documents were served by [respondent] upon [petitioner's] attorney on April 3, 2017, and

there is no indication in the record that there was an answer filed by petitioner until June 22, 2017. The Proof of Service of Answering Discovery filed by [petitioner] on June 22, 2017, only references answering the Response to Request to Produce and not the Interrogatories. [Petitioner] also filed her Motion to Compel a mere 38 days after the date of service of the Request for Production. The record reflects that once Attorney Giesen [respondent's new counsel] became involved in the case the discovery process proceeded in a timely manner.

The Court finds that any delay in the response to [petitioner's] first Request for Production was not intentional on the part of [respondent]. The Court denies [petitioner's] request for an award of attorney's fees for the preparation of the motion to compel."

¶ 29 The trial court next considered petitioner's petition for indirect civil contempt. Regarding respondent's failure to provide notification of his changes of address and employment, the court ruled:

"A careful review of the record and the evidence presented reveals that there was a complete lack of communication between the parties for at least a decade and neither party reported a change of address to the other party as both were required by the terms of the Judgment of Dissolution of Marriage. Shortly after [respondent] lost his job in 2009, he filed a Petition to Modify alleging that he had lost his employment and that he did not have sufficient income to pay the Court ordered support payments including health insurance premiums and daycare. He notified the Illinois Department of Healthcare and Family Services [(IDHFS)] on August 11, 2011, that he was starting a new job on August 15, 2011. IDFHS intervened in the case in 2011 (the IV-D Participation Notice was filed on October

24, 2011; however, the department issued Income Withholding Orders as early as October 22, 2011). It appears that IDHFS was always notified as to [respondent's] changes in employment after they intervened in 2011. In 2016, [respondent] was laid off from his employment and contacted [petitioner] to inform her that he was without employment and to attempt to reach an agreement on a child support modification. The Court finds that [respondent] did not intentionally violate the Court's order regarding reporting change of address and employment."

¶ 30   Regarding respondent's child support arrearage, the trial court noted that respondent's claim that the judgment of dissolution had double counted an initial $700 arrearage was incorrect. The court also ruled:

"[Respondent] acknowledges that he did have a child support arrearage as of the date that [petitioner] sent him a demand letter for payment of certain arrearages. He lost his employment during late September of 2009 and filed a Petition to Modify on January 5, 2010. He did receive minimal income in 2010 from a couple of employers and took a distribution from a Thrift Savings Plan. He acquired a new job in 2011. Once Illinois Child Support Services became involved in 2011 they issued new Income Withholding Orders that withheld additional funds to be applied to the arrearage that accrued between 2009 and 2011. The Income Withholding Notices sent to [respondent's] employers withheld $250.00 bi-weekly for current child support, $100.00 bi-weekly for daycare, $80.00 per month for medical insurance, and $77.39 bi-weekly to be applied to the child support arrearage. Regular withholdings in this amount occurred until 11/22/16 and then the amount changed to $200.00 bi-weekly until 5/15/17.

In March of 2016, [respondent] e-mailed [petitioner] requesting that they agree to a child support modification and enter an Agreed Order with the Court due to his impending layoff effective April 16, 2016. [Petitioner] did not enter into an agreement with [respondent,] and [she] hired an attorney to send [respondent] a demand letter for payment of certain alleged child support, medical, and extracurricular arrearages in October of 2016. The demand letter stated that [petitioner] has not received payment toward the substantial child support arrearage that exists; however, this is an inaccurate statement. [Respondent] had been paying an additional $77.39 bi-weekly towards the child support arrearage since 2012.

Upon receipt of the demand letter from Attorney Considine, [respondent] contacted Attorney Whitcombe and retained his firm to pursue resolution of all alleged arrearages. Approximately March of 2017, [respondent] decided to withdraw funds from his retirement account to pay all arrearages in full. He dealt with IDHFS directly to obtain the amounts owed, including interest, and paid them in full, with the first payment occurring late March of 2017 (processed by IDHFS on April 5, 2017) and all arrearages were paid in full by May 31, 2017. *** The arrearage payments included payment of daycare expenses totaling $39,200 which was calculated as if the minor child attended daycare until the age of 18. ***

The Court finds that [respondent] is not in contempt of Court as a result of the accrual of a child support arrearage. [Respondent] did not willfully and contumaciously disregard a court order. He made efforts, even though they were unsuccessful, to modify the child support order on the two occasions in which he lost his employment. He paid on

the child support arrearage that accrued as a result of his unemployment as is evidenced by the Income Withholding Notices that were entered by IDHFS and the printout from the State Disbursement Unit. Once Attorney Considine sent him a demand letter alleging arrearages he immediately contacted an attorney for assistance and ultimately decided to withdraw the money from his retirement account to pay in full. The process of withdrawing from his retirement account was initiated prior to [petitioner] filing a Petition for Adjudication of Indirect Civil Contempt. Concerned that his attorney was not communicating with Attorney Considine in a timely manner regarding his efforts to pay everything in full, he even e-mailed Attorney Considine directly. The Court finds that Brian's efforts to resolve the matter were reasonable and that his child support obligation is paid in full."

¶ 31 Turning to the issue of medical insurance premiums and medical expenses, the trial court held that petitioner did not provide sufficient evidence regarding the actual cost of providing medical insurance for A.M., and it noted that it appeared that petitioner did not incur any additional cost to add A.M. to her coverage because she was already providing insurance for another child. The court declined to hold respondent in contempt and did not disturb the original $80 per month assessment of respondent's share of the cost of insurance premiums for A.M.

¶ 32 Regarding the uncovered medical expenses, the trial court ruled:

"The evidence is undisputed that [petitioner] initially made a demand of [respondent] for payment of certain expenses by way of e-mail on October 13, 2003. [Respondent] stated that he was unable to make any payments at that time as he was paying on the Jeep as required by the Judgment. [Petitioner] let it go and sent a follow-up e-mail

in 2004 to his work e-mail. [Respondent] was upset that he was receiving this communication through his work e-mail and asked agents from his employment what he could do to stop the harassment. [Respondent] also complained that [petitioner] accumulated bills before requesting payment and then sought a large sum for reimbursement instead of providing copies on a regular basis. [Petitioner] made no further requests for reimbursement after the 2004 e-mail until her attorney sent a demand letter in October of 2016. When the parties had court proceedings in 2010, [petitioner] did not seek to address the reimbursement issue.

The Court does not find [respondent] in contempt for failure to pay one-half of the uncovered medical expenses as [respondent] was not provided any information regarding the expenses until October of 2016. Although, [respondent's] conduct in 2004 may have risen to the level of contempt, [petitioner] did not seek to address the issue until 2017 even though she had an opportunity to address the issue during the 2010 court proceeding. The Court does find that [respondent] owes to [petitioner] the sum of $3,950.18 as his portion of the uncovered medical expenses incurred since the entry of the Judgment of Dissolution of Marriage."

¶ 33 Regarding respondent's unpaid share of extracurricular expenses, the trial court accepted the two exhibits entered into evidence at the hearing and determined that respondent's share of the extracurricular expenses was nearly $3,400 (declining to accept petitioner's claim of only about $763 as respondent's share of A.M.'s extracurricular expenses). The court then held that respondent was not "in contempt for failure to pay these amounts as the majority of them were

never presented to him until after the Petition for Adjudication of Indirect Civil Contempt was filed."

¶ 34 The trial court also addressed respondent's request for reimbursement of his overpayment of child care expenses and his request that any amount of overpayment the court found be used as an offset to the monies the court found him owing on the various arrearages. The court ruled on the overpayment of child care expenses:

> "The most troubling of the issues presented to the Court is the evidence regarding the issue of daycare expenses. The Judgment of Dissolution of Marriage provided in paragraph D that: 'The parties shall be equally liable for child care expenses. Therefore [respondent] shall pay the sum of $100 every two weeks as and for his ½ share of child care expenses. Each party shall continue to be equally responsible for child care expenses until [A.M.] is no longer is [sic] need of child care.' The child care order was never modified or terminated. [Petitioner] never advised [respondent] that [A.M.] was no longer in daycare and even filed a Petition for Adjudication of Indirect Civil Contempt alleging that he owed $11,867.44 in daycare expenses. This appears to be alleged in bad faith. [Petitioner] could not have expected this Court to order [respondent] to pay daycare expenses through the child's 18th birthday.

> The Judgment is quite clear that the parties were only required to pay for child care so long as A.M. was in need of it. The evidence presented on the issue of day care revealed that A.M. was removed from the YMCA daycare on February 23, 2009. At that time, [petitioner] was not working. [Petitioner] testified that she paid a babysitter from time to time and did not use child care services after A.M. turned 12, but she did not produce any

receipts evidencing the amount she paid for child care between February 23, 2009, and April 20, 2011. [Respondent] filed a Petition for Reimbursement of Defendant's Overpayment to Plaintiff for Child Care on September 29, 2017. The Court finds that [respondent's] obligation to pay $100.00 bi-weekly for daycare should have ended on February 23, 2009. [Respondent] has overpaid daycare expenses by the amount of $19,092.02."

¶ 35 The trial court next granted respondent's request that his overpayment of child care expenses be offset against the amount he owed petitioner for the other expenses. The court calculated that petitioner owed respondent $19,092.02, and respondent owed petitioner $7,333.51 in uncovered medical and extracurricular expenses, with a net result that petitioner owed respondent a total of $11,758.51. The court ordered that, in light of the fact that the parties had agreed to each pay one-third of A.M.'s college expenses, "[petitioner] shall pay the first $11,758.51 owed by [respondent] towards [A.M.'s] college expenses." Finally, the court ordered each party to be responsible for his or her own attorney fees.

¶ 36 On April 16, 2018, petitioner filed a motion to reopen the proofs and to reconsider the March 20, 2018, decision. On June 26, 2018, respondent moved to deny the motion to reopen and reconsider. On August 6, 2018, the trial court heard argument on the motion to reopen and reconsider. From time to time during the argument, the court interjected, noting that the evidence established that petitioner had resources to discover respondent's address but chose not to avail herself of them; likewise, petitioner had opportunities to raise the issue as early as 2010 but did not. The trial court denied petitioner's motion orally, but the court did not require its order be

reduced to writing and no written judgment appears in the record.[1]  Nevertheless, within 30 days, on September 5, 2018, petitioner timely filed her notice of appeal.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, petitioner argues that the trial court erred in determining that respondent was not in contempt over his failures to report the changes of his address and employment, and his failure to pay his portion of medical and extracurricular expenses.  Next, petitioner argues that the trial court erred in declining to award her attorney fees in connection with prosecuting her petition for indirect civil contempt.  Last, petitioner argues that the trial court erred in granting respondent's

---

[1] This defect does not affect our jurisdiction.  In *Green v. Green*, 21 Ill. App. 3d 396, 402-03 (1974), the court held that where a written judgment is required by the trial court but not filed, the judgment is held in abeyance until the written judgment is filed; where it is not filed, the appellate court does not have jurisdiction over the issue.  This view was confirmed in *In re Marriage of Zeman*, 198 Ill. App. 3d 722, 739 (1990), in which the appellate court held it lacked jurisdiction over the "bare announcement of the final judgment" until a written judgment was filed.  Likewise, *Cities Service Oil Co. v. Village of Oak Brook*, 84 Ill. App. 3d 381, 383-84 (1980), held that, where the trial court required its oral pronouncement to be reduced to writing, the judgment embodied in the oral pronouncement alone was held in abeyance until such time it was reduced to writing and could not be attacked by motion or appealed from.  Here, the trial court did not require its order on the motion to reopen and reconsider be reduced to writing and the lack of a written order does not, therefore, in accord with *Green* and its subsequent interpretations, disturb our jurisdiction.

request to offset the amounts he was found to owe petition with what she terms "his voluntary overpayment of child care expenses." We consider each contention in turn.

¶ 39                    A. Contempt for Changes of Address and Employment

¶ 40    Petitioner argues that respondent repeatedly admitted that he did not comply with the portions of the dissolution judgment requiring him to "report to [petitioner] *** within 10 days each time he obtains new employment, and each time his employment is terminated for any reason" and requiring both petitioner and respondent to "advise each other of a change in residence within five days of the change." Petitioner contends that with respondent's admission of noncompliance, she established a *prima facie* case of civil contempt, and the burden shifted to respondent to establish that the noncompliance was neither willful nor contumacious and should be excused. Petitioner argues that the evidence adduced at the hearing clearly showed that respondent's noncompliance was calculated to avoid the potential of increases in his child-support obligation because he only reported and sought modifications when his employment had been terminated but never when his income increased. Petitioner argues that the trial court's determination that the noncompliance was excused due to the complete breakdown of communication was erroneous.

¶ 41    Generally, civil contempt occurs where one party does not do something ordered by the trial court resulting in some harm—loss of a benefit or advantage—to the opposing party; indirect civil contempt occurs outside of the presence of the trial court. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Essential to any finding of indirect civil contempt are the existence of a court order and proof that the alleged contemnor willfully disobeyed that order. *Id.* A hearing for indirect civil contempt proceeds in two steps: first, the petitioner must prove by a preponderance of the evidence that the alleged contemnor has violated a court order; second, the

burden is shifted to the alleged contemnor to demonstrate why he or she should not be held in contempt, such as by presenting evidence the noncompliance with the court's order was not willful or contumacious and he or she had a valid excuse for failing to follow the court's order. *Id.* at 107-08.

¶ 42    Appellate review of a trial court's judgment is not altogether clear. The typical formulation is that a trial court's judgment on a contempt order will not be disturbed unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *Id.* at 108. The conjunction appears to be confusing: does a court choose whichever standard of review it believes to be applicable, does it attempt to incorporate both at once, or does it simply recite the entire standard as a shibboleth when it reaches its decision? We have noted, as well, that our supreme court has never abandoned this formulation. See *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984) (proclaiming the standard of review for contempt matters); *In re Marriage of Barile*, 385 Ill. App. 3d 752, 750 (2008) (discussing that *Logston* has not been abandoned). The standard, however, can be harmonized so that both branches are given effect in any case. As the First District Appellate Court noted, *Logston*

"makes explicit a system of double deference to the trial court in contempt proceedings. If the trial court's factual findings are in dispute, we review the record and only reverse those findings that are against the manifest weight of the evidence. If the trial court's factual findings are not in dispute or if those findings are consistent with the manifest weight of the evidence, we review the contempt order for an abuse of discretion, considering the relevant facts." *Shamrock Chicago Corp. v. Wroblewski*, 2019 IL App (1st) 182354, ¶ 29.

The deference embodied in the joint standard is consistent with the typical role of each individual standard. The abuse of discretion standard gives deference to the trial court's ultimate conclusions and allows reversal of rulings that are arbitrary, unreasonable, fanciful, or where no reasonable person would take the view adopted by the circuit court. *Id.* ¶ 30. The manifest-weight-of-the-evidence standard gives deference to the trial court's fact-finding where divergent inferences could have been drawn from the undisputed facts. *Id.* Thus, if the factual findings are correct or if we determine they are not against the manifest weight of the evidence, we determine whether it was not unreasonable for the trial court to reach its ultimate ruling based on its factual findings. *Id.*

¶ 43 This case presents a decidedly odd procedural posture considering the purpose a determination of civil contempt serves. Civil contempt is coercive—it compels the contemnor to perform a specified act. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 43 (1990). Likewise, the coercive effect of civil contempt sanctions is to promote future compliance with the court's order. *In re Marriage of Pavlovich*, 2019 IL App (1st) 172859, ¶ 47. Civil contempt possesses two key attributes: (1) the contemnor must be able to take the action sought to be coerced; and (2) once the contemnor has complied with the order, no further contempt sanctions will be imposed. *Betts*, 200 Ill. App. at 44. With this background, we note that petitioner stated that she initiated the contempt proceeding to compel respondent to pay off his arrearages in child support and the child's uncovered medical expenses and her extracurricular expenses. The trial court's order reflects that respondent fulfilled those obligations. We also note that, during the litigation, A.M. turned 18 years of age and graduated from high school, thus aging out of the provisions of the support order, which expired upon her eighteenth birthday or her graduation from high school, whichever was later. As the arrearages were paid off, the support order was fulfilled.

¶ 44    The fulfillment of the support order would, in turn, seem to negate the reason to require respondent to report changes of employment and for both parties to report changes of address. Thus, there is no reason for compelling future conduct; the requirements of the order have been fulfilled and the arrearages have been brought current. A finding of civil contempt, therefore, could coerce no future conduct as there simply is no future conduct to coerce. Likewise, with the medical and extracurricular expenses—they have been brought current and the child has aged out of the provision. Nothing further exists under the support order or dissolution judgment regarding future conduct, so a finding of civil contempt again would seem unable to coerce respondent's future conduct. As petitioner received the relief she requested, substantively, the appeal would appear to be able to offer no further effective relief were petitioner to prevail and, at least substantively, is moot. *Jackson v. Board of Election Comm'rs of city of Chicago*, 2012 IL 111928, ¶ 36 (where the court cannot grant effective relief, the issue is moot).

¶ 45    However, a reversal of the trial court's judgment on the existence of contempt would result in a mandatory award of attorney fees to petitioner. Section 508(b) of the Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/508(b) (West 2018)), provides that, if "the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court *shall* order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing party." (Emphasis added.) A trial court's finding of contempt implies that the contemnor's failure to follow the court's order was without cause or justification. *In re Marriage of Putzler*, 2013 IL App (2d) 120551, ¶ 38. Where the conduct was without cause or justification, the imposition of attorney fees under section 508(b) of the Act is mandatory. *Id.* ¶ 39. Thus, a reversal of the trial court's judgment on whether petitioner's

noncompliance with the court's orders constitutes contempt would also require the court to impose attorney fees, and this is effective relief sufficient to support this appeal notwithstanding the apparent substantive mootness relative to the judgment of dissolution. With these principles in mind, we turn to petitioner's contentions.

¶ 46 Petitioner argues that respondent admitted, repeatedly, that he did not communicate to her his changes of employment and address. Petitioner reasons that respondent's admissions established a *prima facie* case of contempt and that he then bore the burden of rebutting the *prima facie* case by providing an explanation or justification for his failure to follow the court's order. According to petitioner, respondent provided no justification and thus, the trial court erred in holding that respondent "did not intentionally violate the Court's order regarding reporting changes of address and employment."

¶ 47 As an initial matter, we note that petitioner does not adhere to the Supreme Court Rules because she does not provide citations to the record in support of her factual assertions in the argument portion of her brief. Supreme Court Rule 341(h)(7) (eff. May 25, 2018) requires a party's argument to be supported by both relevant legal authority as well as "citation of the * * * pages of the record relied on." While this noncompliance does not help our ability to review petitioner's arguments, we also note that she provided appropriate record citations in her statement of facts. Nevertheless, the Illinois Supreme Court Rules are not just suggestions a party may follow at whim; they have the force of law and must be complied with. *Super Mix of Wisconsin, Inc. v. Natural Gas Pipeline Co. of America, LLC*, 2020 IL App (2d) 190034, ¶ 28. While petitioner's noncompliance certainly does not make our review easier, it also does not foreclose it, and we

exercise our discretion and choose to review petitioner's argument while strongly admonishing her to carefully observe the rules in the future.

¶ 48    Perhaps tied in with our observations above, we also note that petitioner's argument ignores the trial court's judgment. We recognize that our review is of the trial court's judgment, not its reasoning (*Village of Campton Hills v. Comcast of Illinois V, Inc.*, 2019 IL App (2d) 190055, ¶ 35), yet petitioner ignores not only the trial court's reasoning, but also its factual determinations. This is particularly noticeable where our standard of review requires us to consider whether the trial court's factual findings were contrary to the manifest weight of the evidence. *Shamrock Chicago*, 2019 IL App (1st) 182354, ¶ 29.

¶ 49    Petitioner implicitly argues that, until 2016, she had no way of contacting respondent because he did not report to her any changes in his address. Thus, as her implicit reasoning continues, she could not initiate any proceedings to modify support or to collect arrearages that had accrued in support, medical, and extracurricular expenses. Petitioner further suggests that respondent's motive was exactly to frustrate her ability to modify his support and other obligations, arguing that respondent did not hesitate to seek a modification, either via court process or informally, when he was unemployed. She argues that, at all other times, he did not share his changes in employment, thereby avoiding his obligation to provide increased monetary support as his income increased. Petitioner argues that it is reasonable to infer from respondent's history of only seeking abatement or downward modification that he was willfully disobeying the court's orders to promptly report changes of address and employment in order to avoid having his support obligation modified upward. Based on this inference, petitioner concludes that the trial court erred

in not holding respondent in contempt for failing to comply with the dissolution order's provisions requiring reporting of changes in address and employment.

¶ 50    In order to assess petitioner's argument, we must look at the evidence provided at the hearing and the trial court's factual determinations as well as the trial court's inferences and interpretation of that evidence.    Regarding the requirement of reporting address changes, the evidence in the record indicates that neither party reported any address changes to the other until communications appeared to resume between the parties sometime late in 2014, when respondent resumed the exercise of his visitation rights.    According to petitioner's testimony, she only formally received respondent's address at some point in 2016 when she asked the child to text her respondent's address.    There was no testimony that petitioner ever provided respondent her address.    Moreover, in 2010, respondent filed a petition to modify his child support obligation, and this certainly provided an opportunity for the parties to learn their then-current addresses, whether the parties took advantage of that opportunity.

¶ 51    Based on this evidence, the trial court held that there was a complete breakdown in communication between the parties for about a decade, and this factual determination is amply supported in the record.    Therefore, we cannot say that the trial court's factual determinations regarding the failure to report address changes were against the manifest weight of the evidence.

¶ 52    Regarding the failure to report employment changes, that obligation was on respondent alone.    The evidence adduced at the hearing shows that respondent only reported employment changes to petitioner when he was out of work.    The evidence showed that, in 2010, respondent resigned from his job with the government and was out of work for a time thereafter.    Respondent filed a petition to modify child support shortly after his loss of employment, but the petition was

quickly dismissed for want of prosecution. No evidence appears in the record that the court was notified about respondent's employment changes other than the petition to modify. Early in 2016, respondent was again unemployed, and at this time, he contacted petitioner seeking to come to an agreement about modifying his support obligation downward that the parties could present to the court. By October 2016, petitioner had retained an attorney and was negotiating with respondent about his various arrearages. These interactions eventually developed into the matter before us in this appeal.

¶ 53    In addition to the foregoing, the evidence also showed that, in August 2011, respondent notified the Department that he was beginning new employment and the Department issued an income withholding order. After the Department became involved, respondent continued to consistently notify it about his employment changes, the Department continued to issue withholding orders to each of respondent's employers, and this continued until the instant matter.

¶ 54    Respondent presented testimony that he believed his interactions with the Department after 2011 satisfied the requirements of the judgment of dissolution. While that testimony is present in the record, the trial court does not appear to have given it either much credence or much weight.

¶ 55    On the other hand, the trial court focused on petitioner's explanations for the lack of communication between the parties. Petitioner testified that she was unable to contact respondent because she did not have his address. When asked about obtaining the address from other sources, such as from the child, respondent's wife during a visitation exchange, or respondent himself during his visit during the child's homecoming or prom weekend, petitioner testified that she did not feel it was the right time to bring up matters that might affect the substantive issues. In the hearing on petitioner's motion to reopen and reconsider, the trial court rejected petitioner's

testimony, elaborating on its reasoning from the memorandum opinion: "I guess I didn't really buy that [respondent] was not able to be found. I—he was paying support, *** he could have been found." The trial court also expressed its belief that petitioner knew how to get in touch with respondent, but did not want to ask the child for the information (she nevertheless got the information from the child when it was necessary to help advance her petition for civil contempt). Based on the foregoing, we cannot say that the trial court' factual determinations related to respondent's obligation to report employment changes were against the manifest weight of the evidence.

¶ 56    Next, we consider the trial court's ultimate judgment on contempt for an abuse of discretion. *Shamrock Chicago*, 2019 IL App (1st) 182354, ¶ 29. Turning to the obligation to report changes of address, that obligation was on both parties. Neither party seems to have followed this requirement of the dissolution judgment. In fact, there was little to no communication between the parties about anything for an extended time. While the fact that both petitioner and respondent did not follow the requirements of the dissolution judgment does not excuse the other's noncompliance, it is a fact to be considered. Additionally, we note that the trial court held that, notwithstanding respondent's noncompliance, petitioner was well able to discover his address had she wanted to. With all of these factors considered, we cannot say that the trial court abused its discretion in declining to hold respondent in contempt over his failure to report changes of address. *In re Marriage of Sawyer*, 264 Ill. App. 3d 839, 848-49 (1994) (court considers the circumstances and context of the party's actions rendering its contempt judgment).

¶ 57    With respect to the obligation to report employment changes, that obligation was respondent's alone. Again, the parties' breakdown in communication factored into the trial court's

reasoning in declining to hold respondent in contempt. In addition, respondent was not evading his support obligations and was making a payment each month on the support arrearage through the vehicle of the Department's paycheck withholding order. In its oral ruling on petitioner's motion to reopen and reconsider, the court explained its thinking at the time of its judgment on the petition for contempt. Specifically, it noted that the nonreporting had been occurring effectively for the entirety of the dissolution, and it was concerned that, only now was petitioner bringing it to the court's attention. The court further noted that petitioner had the opportunity in 2010 to raise respondent's failures to report address and employment changes in conjunction with his petition to modify, but she did not take advantage of the opportunity. In addition, the court discredited petitioner's claim that she could not find respondent as he had not reported his changes of address. The court balanced the prejudice accruing from the tardy institution of the contempt proceeding against petitioner's opportunities and declined to hold respondent in contempt for failing to report his changes of employment. We cannot say that the trial court abused its discretion in so holding.

¶ 58             B. Contempt for Unpaid Medical and Extracurricular Expenses

¶ 59    Petitioner also contends that the trial court erred by failing to hold respondent in contempt over his failure to pay his portion of the uncovered medical and extracurricular expenses. Petitioner bases her argument on respondent's failure to provide her with his changes of address. Petitioner reasons that she had no way to contact respondent and so could not timely communicate to him what the expenses and his share of them were. We disagree.

¶ 60    Again, we note that petitioner does not refer to the trial court's judgment in any meaningful or analytical way in fashioning her argument (other than to assert the conclusion that is was

erroneous). Regarding uncovered medical expenses, the trial court stated (and the factual determinations therein are fully applicable to the extracurricular expenses):

"The evidence is undisputed that [petitioner] initially made a demand of [respondent] for payment of certain expenses by was of e-mail on October 13, 2003. [Respondent] stated that he was unable to make any payments at that time as he was paying on the Jeep as required by the Judgement. [Petitioner] let it go and sent a follow-up e-mail in 2004 to [respondent's] work e-mail. [Respondent] was upset that he was receiving this communication through his work e-mail and asked agents from his employment what he could do to stop the harassment. [Respondent] also complained that [petitioner] accumulated bills before requesting payment and then sought a large sum for reimbursement instead of providing copies on a regular basis. [Petitioner] made no further requests for reimbursement after the 2004 e-mail until her attorney sent a demand letter in October of 2016. When the parties had court proceedings in 2010, [petitioner] did not seek to address the reimbursement issue.

The Court does not find [respondent] in contempt for failure to pay one-half of the uncovered medical expenses as [respondent] was not provided any information regarding the expenses until October of 2016. Although, [*sic*] [respondent's] conduct in 2004 may have arisen [*sic*] to the level of contempt, [petitioner] did not seek to address the issue until 2017 even though she had an opportunity to address the issue during the 2010 court proceeding. The Court does find that [respondent] owes to [petitioner] the sum of $3,950.18 as his portion of the uncovered medical expenses incurred since the entry of the Judgment of Dissolution of Marriage."

¶ 61    One aspect of the trial court's judgment is immediately striking: the factual determination that petitioner had the opportunity to address the issue as early as 2010, but she did not. The record also shows that petitioner had a number of opportunities aside from the 2010 proceeding on respondent's petition to modify, such as visitation exchanges or asking A.M., but she did not choose to take advantage of them to present respondent with the bills for the medical and extracurricular expenses. Additionally, as noted above, during the hearing on petitioner's motion to reopen and reconsider, the trial court did not accept, as a matter of fact, petitioner's assertion that she could not contact respondent because he had not been complying with the requirement that he notify her of his changes of address; instead, the trial court determined that petitioner was able to learn of respondent's address had she chosen to do so. We cannot say that the trial court's factual determinations were against the manifest weight of the evidence.

¶ 62    As noted above, the trial court considers the circumstances and context of the parties' behavior in assessing whether to hold the alleged contemnor in contempt. *Sawyer*, 264 Ill. App. 3d 839, 848-49. Here, the trial court factored in the fact that petitioner had at least one formal opportunity in the 2010 proceeding to raise the issue of medical and extracurricular expenses along with the many other opportunities to informally broach the subject. The fact that these opportunities were eschewed until the October 2016 demand letter proved decisive to the trial court's reasoning. We agree. Petitioner could have potentially nipped respondent's behavior in the bud at the 2010 proceeding by raising the medical and extracurricular expenses, as the trial court believed that respondent may have then been held in contempt. However, by waiting and, only in 2016, presenting respondent with the expenses, after which the matter proceeded expeditiously to the contempt, we cannot say that respondent's actions rose to the level of

contempt. Accordingly, we cannot say that the trial court abused its discretion in declining to hold respondent in contempt over the medical and extracurricular expenses.

¶ 63                    C. Attorney Fees for Petition for Indirect Civil Contempt

¶ 64    Petitioner next contends that the trial court abused its discretion in failing to award her attorney fees in connection with the contempt proceedings notwithstanding that respondent was not held in contempt. Section 508 of the Act (750 ILCS 5/508 (West 2018)) authorizes the award of attorney fees in connection with enforcement of court orders. *In re Marriage of Berto*, 344 Ill. App. 3d 705, 716 (2003). Section 508(a) allows the discretionary award of fees based upon consideration of the relative financial resources of the parties. 750 ILCS 5/508(a) (West 2018); *Berto*, 344 Ill. App. 3d at 716. Section 508(b) is a mandatory provision which requires the delinquent party to pay the costs and reasonable attorney fees of the party seeking enforcement. 750 ILCS 5/508(b) (West 2018); *Berto*, 344 Ill. App. 3d at 716. While petitioner does not specify which subsection of the Act applies to her argument, she does not argue that respondent's financial resources were such that it would be fair to have him pay a portion or all of her attorney fees; we therefore infer she is proceeding under section 508(b).

¶ 65    Petitioner initially notes that, if we were to find in her favor on either or both of the arguments about employment- and address-reporting obligations or medical and extracurricular expenses, then section 508(b) is triggered because a finding of contempt is equivalent to the section's "without compelling cause or justification" requirement. *Putzler*, 2013 IL App (2d) 120551, ¶ 39. Even so, in the absence of a contempt finding, we can still find that respondent's conduct was without compelling cause or justification, which would still trigger the mandatory imposition of attorney fees under section 508(b). *Berto*, 344 Ill. App. 3d at 717.

¶ 66     Petitioner's argument focuses on respondent's child support arrearage. (The reporting provision does not have an inherent cost or arrearage associated with it under the dissolution judgment and would not, standing alone, support an enforcement proceeding. Petitioner does not advance the medical and extracurricular expense arrearage to support the enforcement proceeding, likely because while expenses accrued, respondent was not presented with them before 2016, and so he had a reasonable justification for not paying them before the proceeding.) Petitioner argues that the trial court's judgment that respondent "did not willfully and contumaciously disregard the court order" regarding child support payments was against the manifest weight of the evidence. Petitioner argues that, while respondent experienced periods of unemployment, he also experienced periods of bounty during which he earned up to four times the amount he was earning on the date of the dissolution order. Petitioner contends that respondent's nondisclosure of his employment information deprived petitioner of the ability to seek modification based on the greater income. Petitioner reasons that, even though respondent paid off his support arrearage before the hearing (indeed, the trial court determined that respondent began paying off the arrearage before the petition for contempt was filed and this factual determination was not against the manifest weight of the evidence), the proceeding was necessary for petitioner to collect the amounts owed.

¶ 67     Once again, petitioner appears to disregard the trial court's factual conclusions when posing her argument. The trial court's memorandum opinion alludes to its conclusion, expressed during the argument and judgment on petitioner's motion to reopen and reconsider, that, had petitioner only waited, the support arrearage would have been brought current and the enforcement proceeding was unnecessary. Indeed, it appears that respondent contacted petitioner's attorney

directly concerning his intent to use savings to pay all that he owed in support and that he had begun payment before the petition for contempt had been filed. We cannot say that these determinations were against the manifest weight of the evidence. Thus, the conclusion that the enforcement proceeding was unnecessary to collect the monies owed petitioner is likewise well-grounded in the evidence. Based on this conclusion (and the fact that approximately $77 out of each support payment was specifically earmarked to pay down respondent's child-support arrearage), the trial court declined to hold respondent in contempt.

¶ 68    Based on this factual backdrop, we cannot conclude that the trial court erred in declining to order attorney fees under section 508(b). Had petitioner waited, the support arrearage would have been paid. Thus, the enforcement proceeding was unnecessary, and this is adequate justification under section 508(b). Likewise, respondent was continually paying a portion of his support payments toward the support arrearage. He was, in fact, obeying the court order and his obedience negates the requirement of noncompliance under section 508(b). Petitioner's argument, therefore, fails.

¶ 69    Petitioner cites to *In re Marriage of Roach*, 245 Ill. App. 3d 742, 748 (1993), for the proposition that, even though an arrearage was brought current before the contempt hearing, the petitioner still needed to hire an attorney and to file a petition to obtain the amounts she was owed. *Roach* is inapposite. In that case, the enforcement proceeding was necessary; here, the trial court determined, and that determination was not against the manifest weight of the evidence, that the enforcement proceeding was not necessary because petitioner had indicated that he would pay the arrearage in full and had begun doing so before the petition for contempt had been filed.

¶ 70    Petitioner argues that she "did incur attorney's fees in pursuing action that resulted in the payment of funds that were indisputably owed." We agree with the fact that the funds were owed, but the incurrence of attorney fees were unnecessary. Moreover, the only authority presented by petitioner supports the idea that the enforcement action must be necessary to collect the funds owed. Accordingly, we reject the contention.

¶ 71    Pursuant to the foregoing, we hold that the trial court's factual findings (effectively, that respondent had both complied with the order and that any noncompliance was ultimately justified) were not against the manifest weight of the evidence. Accordingly, section 508(b) does not apply and the trial court did not abuse its discretion in otherwise ordering the parties to bear their own attorney fees.

¶ 72                    D. Offset for Overpayment of Child Care Expenses

¶ 73    Petitioner last contends that the trial court erred in offsetting respondent's overpayment of child care expenses against the amounts respondent owed in unpaid medical and extracurricular expenses. Petitioner argues that the overpayment of child care expenses was a voluntary overpayment and that the voluntary overpayment of child support doctrine should also apply to child care expenses.

¶ 74    In general, no credit is allowed for voluntary overpayment of child support. *In re Marriage of Tollison*, 208 Ill. App. 3d 17, 19-20 (1991). The underlying rationale of the general rule is to prohibit unilateral modification of child support obligations and a concern that overpayment credits might deprive the child of future benefits. *Id.* However, the general rule may give way where equity requires, and no hardship will result. *Id.* In *Tollison*, the court specifically held that,

where the overpayment was involuntary, such as pursuant to a wage deduction order, then the general rule will not apply, assuming no hardship to the child would result. *Id.* at 20-21.

¶ 75    In this case, we do not believe that petitioner's contention even comes under the purview of the general rule noted in *Tollison*. Here, respondent overpaid on his child *care* obligation, not his child *support* obligation. The judgment of dissolution specifically stated that "[e]ach party shall continue to be equally responsible for child care expenses until [A.M.] is no longer in need of child care." Thus, the terms of the dissolution judgment only required respondent to pay his one-half share of child care expenses until A.M. "no longer [needed] child care." The evidence showed that, in February 2009, A.M. was withdrawn from the child care program at the YMCA. Petitioner testified that, from 2009 to A.M.'s twelfth birthday in 2011, A.M no longer needed daily child care and that, from time to time, she would obtain a babysitter, but petitioner was unable to provide any receipts for her occasional uses of child care. Petitioner further testified that, after A.M.'s twelfth birthday in 2011, A.M. no longer needed child care at all. Because petitioner could provide no receipts for child care for the interim period between February 2009 and A.M.'s twelfth birthday, the trial court concluded that child care had ceased in February 2009 and respondent was no longer required to pay child care.

¶ 76    First, the trial court's conclusion is not against the manifest weight of the evidence. We also note that despite the expiration of the child care obligation under the terms of the dissolution judgment, the child support obligation continued. Thus, the dissolution judgment distinguished between child support (which continued until A.M. graduated high school) and child care, which continued until A.M. no longer needed it. This distinction is also reflected statutorily. See 750 ILCS 5/505 (West 2018) (defining child support and child care expenses).

¶ 77     Next, and more importantly, petitioner's cases refer to the rule that no credit will be given for overpayment of child *support*. *In re Marriage of Olsen*, 229 Ill. pp. 3d 107 (1992) (reciting general rule about overpayment of child support but noting that equity required credit for the overpayment under the circumstances of the case); *Tollison*, 208 Ill. App. 3d 17 (discussed above); *Harner v. Harner*, 105 Ill. App. 3d 430 (1982) (nothing in the circumstances of the case prevented the application of the general rule about overpayment of child support). Petitioner does not cite to any cases discussing the voluntary overpayment of child *care* expenses or extending the rule regarding overpayment of child *support* to child *care* obligations; likewise, our own research has uncovered none. Thus, petitioner's argument is inapposite to the facts of the case.

¶ 78     Moreover, the rationale of the general rule, that the unilateral adjustment or permitted crediting of child support might deprive the child of future benefits does not seem to be present. Even if A.M. were still receiving child care, it is a discrete service and the credit against such a service would not seem to deprive the child of any benefits she would be due. By contrast, child support is for the direct benefit of the child, and providing a credit now obviously impacts that benefit for some future period. Thus, the rule against crediting overpayment of child support is simply inapplicable to an overpayment of child care and the trial court did not run afoul of any strictures prohibiting the crediting of such overpayments.

¶ 79     Thus, the rule cited by petitioner regarding overpayment of child *support* does not apply to child *care*, no authority has been found to extend the rule to cover child *care*, and the rationale for the rule does not apply with any force to child *care*. We hold, therefore, that the trial court did not err in allowing respondent's overpayment of child care expenses to offset the amounts he owed for unpaid medical and extracurricular expenses.

¶ 80     We also note that petitioner seems to use the overpayment as a proxy for some hypothetical entitlement to retroactive increases in child support had respondent reported his changes in employment to her.  However, in her petition for indirect civil contempt, she did not raise this issue, and she does not directly do so here.  To the extent, therefore, that a retroactive modification in child support is being requested on appeal, it is forfeited because an issue not raised in the trial court may not be presented for the first time on appeal.  *Super Mix of Wisconsin*, 2020 IL App (2d) 190034, ¶ 25.

¶ 81                                    III. CONCLUSION

¶ 82     For the foregoing reasons, the judgment of the circuit court of Lee County is affirmed.

¶ 83     Affirmed.